# 26-638

# United States Court of Appeals for the Second Circuit

YESHIVA OHR SHRAGA VERETZKY,

*Plaintiff-Appellant,*

-against-

TOWN OF HIGHLAND ZONING BOARD OF APPEALS,
TOWN OF HIGHLAND,

*Defendants-Appellees,*

TOWN OF HIGHLAND PLANNING BOARD,
TOWN BOARD OF THE TOWN OF HIGHLAND,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
Volume I of II (Pages JA-1 - JA-154)

SBARSHOVLAW PLLC
*Attorneys for Plaintiff-Appellant*
20 Lagoon Lane
Haverstraw, New York 10927
(917) 886-4326
sb@sbarshovlaw.com

SOKOLOFF STERN LLP
*Attorneys for Defendants-Appellees*
179 Westbury Avenue, Suite 201
Carle Place, New York 11514
(516) 334-4500
ldorfman@sokoloffstern.com

**4908**


ELECTRONIC
PARALEGAL

i

# TABLE OF CONTENTS

Docket Entries ...............................................................................................JA-1

Summons in Civil Action, Dated November 12, 2024 (ECF No. 5)..............JA-9

First Amended Verified Complaint for Declaratory Judgment and
Injunctive Relief, Dated March 31, 2025 (ECF No. 12) .............................JA-11

    Exhibit A to First Amended Verified Complaint -
    District Schedule of Use Regulations Town of Highland
    (ECF No. 12-1) ................................................................................JA-52

    Exhibit B to First Amended Verified Complaint -
    Letter from John D. Fuller, P.E. to Norman Sutherland,
    Dated February 10, 2023, with Special Use Permit Application and
    Environmental Assessment Form (ECF No. 12-2) ...........................JA-55

    Exhibit C to First Amended Verified Complaint -
    Sketch Site Plan (ECF No. 12-3).......................................................JA-64

    Exhibit D to First Amended Verified Complaint -
    Town of Highland Planning Board Meeting Minutes,
    Dated March 22, 2023 (ECF No. 12-4)..............................................JA-65

    Exhibit E to First Amended Verified Complaint -
    Memorandum of Law, Dated April 27, 2023 (ECF No. 12-5)...........JA-84

    Exhibit F to First Amended Verified Complaint -
    Excerpts of Town of Highland Planning Board Meeting Minutes,
    Dated June 28, 2023 (ECF No. 12-6) .................................................JA-98

    Exhibit G to First Amended Verified Complaint -
    Excerpts of Town of Highland Planning Board Meeting Minutes,
    Dated August 23, 2023 (ECF No. 12-7) ..........................................JA-106

    Exhibit H to First Amended Verified Complaint -
    Excerpts of Town of Highland Planning Board Meeting Minutes,
    Dated October 25, 2023 (ECF No. 12-8) ..........................................JA-112

ii

Exhibit I to First Amended Verified Complaint -
Memorandum from Steven Barshov to Town of Highland
Planning Board, Dated November 17, 2023 (ECF No. 12-9)..........JA-117

Exhibit J to First Amended Verified Complaint -
Letter from John D. Fuller, P.E. to Norman Sutherland,
Dated November 17, 2023 (ECF No. 12-10) ....................................JA-119

Exhibit K to First Amended Verified Complaint -
Site Plan for Yeshiva OHR Shraga Veretzky (ECF No. 12-11)......JA-121

Exhibit L to First Amended Verified Complaint -
Excerpts of Town of Highland Planning Board Meeting Minutes,
Dated November 29, 2023 (ECF No. 12-12) ....................................JA-139

Exhibit M to First Amended Verified Complaint -
Excerpts of Town of Highland Planning Board Meeting Minutes,
Dated December 20, 2023 (ECF No. 12-13)....................................JA-141

Exhibit N to First Amended Verified Complaint -
Town of Highland Planning Board Re-Organization Meeting
Minutes, Dated January 2, 2024 (ECF No. 12-14).........................JA-147

Exhibit O to First Amended Verified Complaint -
Town of Highland Special Town Board Meeting Minutes,
Dated January 4, 2024 (ECF No. 12-15) ........................................JA-150

Exhibit P to First Amended Verified Complaint -
Letter from Steven Barshov to Town of Highland Planning
Board, Dated January 12, 2023 (ECF No. 12-16) ...........................JA-152

Exhibit Q to First Amended Verified Complaint -
Town of Highland Planning Board Meeting Minutes,
Dated January 24, 2024 (ECF No. 12-17) ......................................JA-154

Exhibit R to First Amended Verified Complaint -
Letter from Steven Barshov to Town of Highland Planning Board,
Dated March 5, 2024 (ECF No. 12-18)............................................JA-161

Exhibit S to First Amended Verified Complaint -
Letter from Steven Barshov to Town of Highland Planning Board,
Dated March 20, 2024 (ECF No. 12-19)..........................................JA-162

iii

Exhibit T to First Amended Verified Complaint -
Letter from Steven N. Mogel to SBarshovLaw PLLC,
Dated March 20, 2024 (ECF No. 12-20)............................................JA-164

Exhibit U to First Amended Verified Complaint -
Town of Highland Zoning Board of Appeals Meeting Minutes,
Dated April 16, 2024 (ECF No. 12-21)..............................................JA-165

Exhibit V to First Amended Verified Complaint -
Town of Highland Zoning Board of Appeals Meeting Minutes,
Dated May 20, 2024 (ECF No. 12-22)................................................JA-168

Exhibit W to First Amended Verified Complaint -
Town of Highland Zoning Board of Appeals Meeting Minutes,
Dated June 20, 2024 (ECF No. 12-23)...............................................JA-175

Exhibit X to First Amended Verified Complaint -
Town of Highland Zoning Board of Appeals Meeting Minutes,
Dated July 18, 2024 (ECF No. 12-24)................................................JA-183

Exhibit Y to First Amended Verified Complaint -
Town of Highland Zoning Board of Appeals Meeting Minutes,
Dated July 18, 2024 (ECF No. 12-25)................................................JA-188

Statement of Interest of the United States of America,
Dated July 29, 2025 (ECF No. 19) .....................................................JA-193

Defendants' Notice of Motion to Dismiss, Dated May 29, 2025
(ECF No. 22)......................................................................................JA-219

Defendants' Supporting Memorandum of Law,
Dated May 29, 2024 (ECF No. 23) .....................................................JA-220

Plaintiff's Opposing Memorandum of Law, Dated July 7, 2025
(ECF No. 24)......................................................................................JA-243

Defendants' Reply Memorandum of Law, Dated August 7, 2025
(ECF No. 25)......................................................................................JA-256

Opinion and Order of Hon. Cathy Seibel, Dated March 5, 2026
(ECF No. 26)......................................................................................JA-270

iv

Judgment of United States District Court Southern District of
New York, Dated March 7, 2026, Appealed From (ECF No. 27) .............JA-299

Notice of Appeal, Dated March 11, 2026 (ECF No. 28) ...........................JA-310

SDNY CM/ECF NextGen Version 1.8.5          https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

Query     Reports     Utilities     Help     Log Out

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:24-cv-08477-CS

Shraga Veretzky v. Town of Highland Zoning Board of Appeals et al          Date Filed: 11/07/2024
Date Terminated: 03/07/2026
Assigned to: Judge Cathy Seibel          Jury Demand: None
Cause: 28:1331cv Fed. Question: Other Civil Rights          Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Yeshiva Ohr Shraga Veretzky**          represented by   **Steven Barshov**
Sbarshovlaw PLLC
20 Lagoon Lane
Haverstraw, NY 10927
917-886-4328
Email: sb@sbarshovlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Town of Highland Zoning Board of Appeals**          represented by   **Leo Dorfman**
Sokoloff Stern LLP
179 Westbury Avenue,
Carle Place, NY 11514
(516) 334-4500
Fax: (516) 334-4501
Email: ldorfman@sokoloffstern.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Town of Highland Planning Board**
*TERMINATED: 04/01/2025*          represented by   **Leo Dorfman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Town Board of the Town of Highland**
*TERMINATED: 04/01/2025*          represented by   **Leo Dorfman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Town of Highland**          represented by   **Leo Dorfman**
(See above for address)
*ATTORNEY TO BE NOTICED*

1 of 8          4/10/2026, 10:31 AM

SDNY CM/ECF NextGen Version 1.8.5

https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

**Amicus**

**UNITED STATES OF AMERICA**

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 11/07/2024 | 1 | ☐ | COMPLAINT against Town Board of the Town of Highland, Town of Highland, Town of Highland Planning Board, Town of Highland Zoning Board of Appeals. (Filing Fee $ 405.00, Receipt Number ANYSDC-30153197)Document filed by Yeshiva Ohr Shraga Veretzky. (Attachments: # 1 Exhibit District Schedule of Use Regulations, # 2 Exhibit Cover Letter, Preliminary Application, EAF - 2-10-2023, # 3 Exhibit Site Plan - 2-10-2023, # 4 Exhibit Minutes Excerpts - Planning Board - 3-22-2023, # 5 Exhibit Religious Memo of Law - 04-27-2023, # 6 Exhibit Minutes Excerpts - Planning Board - 06-28-2023, # 7 Exhibit Minutes Excerpts - Planning Board - 08-23-2023, # 8 Exhibit Minutes Excerpts - Planning Board -10-25-2023, # 9 Exhibit Religious Use Memo 11-17-2023, # 10 Exhibit Fuller Letter to Planning Board - 11-17-23, # 11 Exhibit Site Plan - 11-17-2023, # 12 Exhibit Minutes Excerpts - Planning Board - 11-29-2023, # 13 Exhibit Minutes Excerpts - Planning Board - 12-20-2024, # 14 Exhibit Town Board Minutes - 01-02-2024, # 15 Exhibit Town Board Minutes - 01-04-2024, # 16 Exhibit SB Letter to Planning Board 01-12-2024, # 17 Exhibit Planning Board Minutes -01-24-2024, # 18 Exhibit Barshov Letter to Planning Board and ZBA - 03-05-2024, # 19 Exhibit Barshov Letter to Planning Board and ZBA 03-20-2024, # 20 Exhibit Mogel Letter to Barshov 03-20-2024, # 21 Exhibit ZBA Minutes - 04-16-2024, # 22 Exhibit ZBA Minutes - 05-21-2024, # 23 Exhibit ZBA Minutes - 06-20-2024, # 24 Exhibit ZBA Minutes -07-18-2024, # 25 Exhibit Officially Filed ZBA Interpretation).(Barshov, Steven) (Entered: 11/07/2024) |
| | | ☐ 0 | Main Document — 39 pages — 452.3 KB |
| | | ☐ 1 | Exhibit District Schedule of Use Regulations — 3 pages — 94.3 KB |
| | | ☐ 2 | Exhibit Cover Letter, Preliminary Application, EAF - 2-10-2023 — 9 pages — 822.5 KB |
| | | ☐ 3 | Exhibit Site Plan - 2-10-2023 — 1 page — 838.4 KB |
| | | ☐ 4 | Exhibit Minutes Excerpts - Planning Board - 3-22-2023 — 19 pages — 3.6 MB |
| | | ☐ 5 | Exhibit Religious Memo of Law - 04-27-2023 — 14 pages — 1.7 MB |
| | | ☐ 6 | Exhibit Minutes Excerpts - Planning Board - 06-28-2023 — 8 pages — 1.4 MB |
| | | ☐ 7 | Exhibit Minutes Excerpts - Planning Board - 08-23-2023 — 6 pages — 1.1 MB |
| | | ☐ 8 | Exhibit Minutes Excerpts - Planning Board -10-25-2023 — 5 pages — 858.9 KB |
| | | ☐ 9 | Exhibit Religious Use Memo 11-17-2023 — 2 pages — 115.3 KB |

SDNY CM/ECF NextGen Version 1.8.5

https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | | | |
|---|---|---|---|---|---|
| | | | ☐ 10 Exhibit Fuller Letter to Planning Board - 11-17-23 | 2 pages | 130.1 KB |
| | | | ☐ 11 Exhibit Site Plan - 11-17-2023 | 18 pages | 8.7 MB |
| | | | ☐ 12 Exhibit Minutes Excerpts - Planning Board - 11-29-2023 | 2 pages | 433.0 KB |
| | | | ☐ 13 Exhibit Minutes Excerpts - Planning Board - 12-20-2024 | 6 pages | 1.1 MB |
| | | | ☐ 14 Exhibit Town Board Minutes - 01-02-2024 | 3 pages | 122.8 KB |
| | | | ☐ 15 Exhibit Town Board Minutes - 01-04-2024 | 2 pages | 107.3 KB |
| | | | ☐ 16 Exhibit SB Letter to Planning Board 01-12-2024 | 2 pages | 19.8 KB |
| | | | ☐ 17 Exhibit Planning Board Minutes -01-24-2024 | 7 pages | 1.2 MB |
| | | | ☐ 18 Exhibit Barshov Letter to Planning Board and ZBA - 03-05-2024 | 1 page | 137.7 KB |
| | | | ☐ 19 Exhibit Barshov Letter to Planning Board and ZBA 03-20-2024 | 2 pages | 136.9 KB |
| | | | ☐ 20 Exhibit Mogel Letter to Barshov 03-20-2024 | 1 page | 41.7 KB |
| | | | ☐ 21 Exhibit ZBA Minutes - 04-16-2024 | 3 pages | 54.6 KB |
| | | | ☐ 22 Exhibit ZBA Minutes - 05-21-2024 | 7 pages | 99.2 KB |
| | | | ☐ 23 Exhibit ZBA Minutes - 06-20-2024 | 8 pages | 1.1 MB |
| | | | ☐ 24 Exhibit ZBA Minutes -07-18-2024 | 5 pages | 235.5 KB |
| | | | ☐ 25 Exhibit Officially Filed ZBA Interpretation | 5 pages | 153.0 KB |
| 11/08/2024 | | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Cathy Seibel. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 11/08/2024) | | |
| 11/08/2024 | | | Magistrate Judge Judith C. McCarthy is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 11/08/2024) | | |
| 11/08/2024 | | | Case Designated ECF. (pc) (Entered: 11/08/2024) | | |
| 11/08/2024 | | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Steven Barshov. The party information for the following party/parties has been modified: Yeshiva Ohr Shraga Veretzky. The information for the party/parties has been modified for the following reason/reasons: party text was removed;. (pc) (Entered: 11/08/2024) | | |

SDNY CM/ECF NextGen Version 1.8.5        https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | |
|---|---|---|---|
| 11/08/2024 | | | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Steven Barshov. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (pc) (Entered: 11/08/2024) |
| 11/08/2024 | 2 | ☐ | CIVIL COVER SHEET filed..(Barshov, Steven) (Entered: 11/08/2024) |
| 11/08/2024 | 3 | ☐ | FILING ERROR - CORPORATE PARENT/OTHER AFFILIATE NOT ADDED - RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Yeshiva Ohr Shraga Veretzky..(Barshov, Steven) Modified on 11/12/2024 (lb). (Entered: 11/08/2024) |
| 11/08/2024 | 4 | ☐ | REQUEST FOR ISSUANCE OF SUMMONS as to Town of Highland Zoning Board of Appeals, Town of Highland Planning Board, Town Board of the Town of Highland, Town of Highland, re: 1 Complaint,,,,,,. Document filed by Yeshiva Ohr Shraga Veretzky..(Barshov, Steven) (Entered: 11/08/2024) |
| 11/12/2024 | | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Notice to Attorney Steven Barshov to RE-FILE Document No. 3 Rule 7.1 Corporate Disclosure Statement,. The filing is deficient for the following reason(s): the corporate parent/other affiliate was not added;. Re-file the document using the event type Rule 7.1 Corporate Disclosure Statement found under the event list Other Documents - select the correct filer/filers - attach the correct signed PDF - when prompted with the message "Are there any corporate parents or other affiliates?", select the Yes or No radio button - If Yes - enter the corporate parent/other affiliate, click the Search button - select the correct corporate parent/other affiliate name from the search results list or if no person found, create a new corporate parent/other affiliate - select the party to whom the corporate parent/other affiliate should be linked - add corporate parent/other affiliate names one at a time. (lb) (Entered: 11/12/2024) |
| 11/12/2024 | 5 | ☐ | ELECTRONIC SUMMONS ISSUED as to Town Board of the Town of Highland, Town of Highland, Town of Highland Planning Board, Town of Highland Zoning Board of Appeals. (sj) (Entered: 11/12/2024) |
| 12/20/2024 | 6 | ☐ | NOTICE OF APPEARANCE by Leo Dorfman on behalf of Town of Highland Zoning Board of Appeals, Town of Highland Planning Board, Town Board of the Town of Highland, Town of Highland..(Dorfman, Leo) (Entered: 12/20/2024) |
| 12/20/2024 | 7 | ☐ | LETTER MOTION for Extension of Time *to respond to the Complaint* addressed to Judge Cathy Seibel from Leo Dorfman dated 12/20/2024. Document filed by Town of Highland Zoning Board of Appeals, Town of Highland Planning Board, Town Board of the Town of Highland, Town of Highland..(Dorfman, Leo) (Entered: 12/20/2024) |
| 12/20/2024 | 8 | | ORDER granting 7 Letter Motion for Extension of Time: Defendants may have until 1/30/25 to respond to the Complaint. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 12/20/2024) |
| 01/30/2025 | 9 | ☐ | LETTER MOTION for Conference - *Pre-Motion Conference in Anticipation of Defendants' Motion to Dismiss* addressed to Judge Cathy Seibel from Leo |

SDNY CM/ECF NextGen Version 1.8.5 · https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | |
|---|---|---|---|
| | | | Dorfman dated January 30, 2025. Document filed by Town of Highland Zoning Board of Appeals, Town of Highland Planning Board, Town Board of the Town of Highland, Town of Highland..(Dorfman, Leo) (Entered: 01/30/2025) |
| 01/31/2025 | 10 | | ORDER granting 9 Letter Motion for Pre-Motion Conference: Telephonic pre-motion conference set for 2/27/25 at 10:45 am. The Webex call-in number is 855-244-8681 and the access code is 1809850784#. Plaintiff shall respond to Defendants' letter, by letter of no more than 3 pages, no later than 2/20/25. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (sm) (Entered: 01/31/2025) |
| 02/20/2025 | 11 | ☐ | LETTER RESPONSE in Opposition to Motion addressed to Judge Cathy Seibel from Steven Barshov dated February 20, 2025 re: 9 LETTER MOTION for Conference - *Pre-Motion Conference in Anticipation of Defendants' Motion to Dismiss* addressed to Judge Cathy Seibel from Leo Dorfman dated January 30, 2025. . Document filed by Yeshiva Ohr Shraga Veretzky..(Barshov, Steven) (Entered: 02/20/2025) |
| 02/27/2025 | | | Minute Entry for proceedings held before Judge Cathy Seibel: Pre-Motion Conference held on 2/27/2025. Plaintiff's counsel Steven Barshov, Esq. appears telephonically. Defendants' counsel Leo Dorfman, Esq. appears telephonically. Law Clerk Samantha Mitchell appears telephonically. The Court grants Plaintiff leave to amend Complaint. Plaintiff's Amended Complaint to be submitted by March 31, 2025. Defendants' Motion to Dismiss to be submitted by May 15, 2025; Plaintiff's opposition due June 16, 2025; Defendants' reply due July 10, 2025. This proceeding was recorded via the Cisco Webex platform. (wc) (Entered: 02/27/2025) |
| 03/31/2025 | 12 | ☐ | FIRST AMENDED COMPLAINT amending 1 Complaint,,,,,, against Town of Highland, Town of Highland Zoning Board of Appeals.Document filed by Yeshiva Ohr Shraga Veretzky. Related document: 1 Complaint,,,,,,. (Attachments: # 1 Exhibit District Schedule of Use Regulations, # 2 Exhibit Cover Letter, Preliminary Application, EAF - 2-10-2023, # 3 Exhibit Site Plan - 2-10-2023, # 4 Exhibit Minutes Excerpts - Planning Board - 3-22-2023, # 5 Exhibit Religious Memo of Law - 04-27-2023, # 6 Exhibit Minutes Excerpts - Planning Board - 06-28-2023, # 7 Exhibit Minutes Excerpts - Planning Board - 08-23-2023, # 8 Exhibit Minutes Excerpts - Planning Board -10-25-2023, # 9 Exhibit Religious Use Memo 11-17-2023, # 10 Exhibit Fuller Letter to Planning Board - 11-17-23, # 11 Exhibit Site Plan - 11-17-2023, # 12 Exhibit Minutes Excerpts - Planning Board - 11-29-2023, # 13 Exhibit Minutes Excerpts - Planning Board - 12-20-2024, # 14 Exhibit Town Board Minutes - 01-02-2024, # 15 Exhibit Town Board Minutes - 01-04-2024, # 16 Exhibit SB Letter to Planning Board 01-12-2024, # 17 Exhibit Planning Board Minutes -01-24-2024, # 18 Exhibit SB Letter to Planning Board, # 19 Exhibit Barshov Letter to Planning Board, # 20 Exhibit Mogel Letter to Barshov, # 21 Exhibit ZBA Minutes - 04-16-2024, # 22 Exhibit ZBA Minutes - 05-21-2024, # 23 Exhibit ZBA Minutes - 06-20-2024, # 24 Exhibit ZBA Minutes - 07-18-2024, # 25 Exhibit Officially Filed ZBA Interpretation).(Barshov, Steven) (Entered: 03/31/2025) |
| | | | ☐ 0  Main Document — 41 pages — 451.6 KB<br>☐ 1  Exhibit District Schedule of Use Regulations — 3 pages — 94.3 KB |

SDNY CM/ECF NextGen Version 1.8.5　　　　　　https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | | | |
|---|---|---|---|---|---|
| | | | ☐ 2 | Exhibit Cover Letter, Preliminary Application, EAF - 2-10-2023 | 9 pages | 822.5 KB |
| | | | ☐ 3 | Exhibit Site Plan - 2-10-2023 | 1 page | 838.4 KB |
| | | | ☐ 4 | Exhibit Minutes Excerpts - Planning Board - 3-22-2023 | 19 pages | 3.6 MB |
| | | | ☐ 5 | Exhibit Religious Memo of Law - 04-27-2023 | 14 pages | 1.7 MB |
| | | | ☐ 6 | Exhibit Minutes Excerpts - Planning Board - 06-28-2023 | 8 pages | 1.4 MB |
| | | | ☐ 7 | Exhibit Minutes Excerpts - Planning Board - 08-23-2023 | 6 pages | 1.1 MB |
| | | | ☐ 8 | Exhibit Minutes Excerpts - Planning Board -10-25-2023 | 5 pages | 858.9 KB |
| | | | ☐ 9 | Exhibit Religious Use Memo 11-17-2023 | 2 pages | 115.3 KB |
| | | | ☐ 10 | Exhibit Fuller Letter to Planning Board - 11-17-23 | 2 pages | 130.1 KB |
| | | | ☐ 11 | Exhibit Site Plan - 11-17-2023 | 18 pages | 8.7 MB |
| | | | ☐ 12 | Exhibit Minutes Excerpts - Planning Board - 11-29-2023 | 2 pages | 433.0 KB |
| | | | ☐ 13 | Exhibit Minutes Excerpts - Planning Board - 12-20-2024 | 6 pages | 1.1 MB |
| | | | ☐ 14 | Exhibit Town Board Minutes - 01-02-2024 | 3 pages | 122.8 KB |
| | | | ☐ 15 | Exhibit Town Board Minutes - 01-04-2024 | 2 pages | 107.3 KB |
| | | | ☐ 16 | Exhibit SB Letter to Planning Board 01-12-2024 | 2 pages | 19.8 KB |
| | | | ☐ 17 | Exhibit Planning Board Minutes -01-24-2024 | 7 pages | 1.2 MB |
| | | | ☐ 18 | Exhibit SB Letter to Planning Board | 1 page | 137.7 KB |
| | | | ☐ 19 | Exhibit Barshov Letter to Planning Board | 2 pages | 136.9 KB |
| | | | ☐ 20 | Exhibit Mogel Letter to Barshov | 1 page | 41.7 KB |
| | | | ☐ 21 | Exhibit ZBA Minutes - 04-16-2024 | 3 pages | 54.6 KB |
| | | | ☐ 22 | Exhibit ZBA Minutes - 05-21-2024 | 7 pages | 99.2 KB |
| | | | ☐ 23 | Exhibit ZBA Minutes - 06-20-2024 | 8 pages | 1.1 MB |
| | | | ☐ 24 | Exhibit ZBA Minutes - 07-18-2024 | 5 pages | 235.5 KB |
| | | | ☐ 25 | Exhibit Officially Filed ZBA Interpretation | 5 pages | 153.0 KB |
| 05/13/2025 | 13 | ☐ | | FIRST LETTER MOTION for Extension of Time to File Answer re: 12 Amended Complaint,,,,,, addressed to Judge Cathy Seibel from Leo Dorfman dated 5/13/2025. Document filed by Town of Highland, Town of Highland | |

SDNY CM/ECF NextGen Version 1.8.5      https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | |
|---|---|---|---|
| | | | Zoning Board of Appeals..(Dorfman, Leo) (Entered: 05/13/2025) |
| 05/14/2025 | 14 | | ORDER granting 13 Letter Motion for Extension of Time to Answer: All Defendants may have until 5/29/25 to respond to the Amended Complaint. No further extensions. Assuming a motion to dismiss is made, Plaintiff's opposition will be due June 30, 2025, and Defendants' reply will be due July 24, 2025. Counsel for Defendants are again encouraged, unless their clients refuse, to discuss possible settlement with Plaintiff. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 05/14/2025) |
| 05/14/2025 | 15 | ☐ | LETTER addressed to Judge Cathy Seibel from Steven Barshov dated May 14, 2025 re: Defendants' Request for Extension. Document filed by Yeshiva Ohr Shraga Veretzky..(Barshov, Steven) (Entered: 05/14/2025) |
| 05/29/2025 | 16 | ☐ | LETTER addressed to Judge Cathy Seibel from Brian S. Sokoloff dated May 29, 2025 re: service of Motion to Dismiss on Plaintiff. Document filed by Town of Highland, Town of Highland Zoning Board of Appeals..(Sokoloff, Brian) (Entered: 05/29/2025) |
| 06/30/2025 | 17 | ☐ | LETTER addressed to Judge Cathy Seibel from Steven Barshov dated June 30, 2025 re: Request for Extension of Time. Document filed by Yeshiva Ohr Shraga Veretzky..(Barshov, Steven) (Entered: 06/30/2025) |
| 06/30/2025 | 18 | | ORDER re: 17 Letter filed by Yeshiva Ohr Shraga Veretzky; Plaintiff's opposition to motion to be served by 7/7/25. Defendants' reply to be served, and all papers to be filed, by 7/31/25. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 06/30/2025) |
| 07/29/2025 | 19 | ☐ | MEMORANDUM OF LAW *(Statement of Interest of the United States of America)*. Document filed by UNITED STATES OF AMERICA..(Onozawa, Tomoko) (Entered: 07/29/2025) |
| 07/31/2025 | 20 | ☐ | FIRST LETTER MOTION for Extension of Time to File Response/Reply *in support of Defendants' Motion to Dismiss* addressed to Judge Cathy Seibel from Leo Dorfman dated July 31, 2025. Document filed by Town of Highland, Town of Highland Zoning Board of Appeals..(Dorfman, Leo) (Entered: 07/31/2025) |
| 07/31/2025 | 21 | | ORDER granting 20 Letter Motion for Extension of Time to File Response/ Reply: Defendants' reply to be served, and all papers to be filed, no later than 8/7/25. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 07/31/2025) |
| 08/07/2025 | 22 | ☐ | MOTION to Dismiss *Plaintiff's Amended Complaint*. Document filed by Town of Highland, Town of Highland Zoning Board of Appeals..(Dorfman, Leo) (Entered: 08/07/2025) |
| 08/07/2025 | 23 | ☐ | MEMORANDUM OF LAW in Support re: 22 MOTION to Dismiss *Plaintiff's Amended Complaint*. . Document filed by Town of Highland, Town of Highland Zoning Board of Appeals..(Dorfman, Leo) (Entered: 08/07/2025) |
| 08/07/2025 | 24 | ☐ | MEMORANDUM OF LAW in Opposition re: 22 MOTION to Dismiss *Plaintiff's Amended Complaint. (submitted for Plaintiff)*. Document filed by Town of Highland, Town of Highland Zoning Board of Appeals..(Dorfman, Leo) (Entered: 08/07/2025) |
| 08/07/2025 | 25 | ☐ | REPLY MEMORANDUM OF LAW in Support re: 22 MOTION to Dismiss *Plaintiff's Amended Complaint*. . Document filed by Town of Highland, Town of |

SDNY CM/ECF NextGen Version 1.8.5        https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?106619934183304-L_1_0-1

| | | | |
|---|---|---|---|
| | | | Highland Zoning Board of Appeals..(Dorfman, Leo) (Entered: 08/07/2025) |
| 03/05/2026 | 26 | ☐ | OPINION & ORDER ON MOTION TO DISMISS re: 22 MOTION to Dismiss *Plaintiff's Amended Complaint.* filed by Town of Highland, Town of Highland Zoning Board of Appeals.For the foregoing reasons, Defendants' motion to dismiss is GRANTED and Plaintiff's claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 22), and close the case. SO ORDERED. (Signed by Judge Cathy Seibel on 3/5/2026) (jjc) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/05/2026) |
| 03/07/2026 | 27 | ☐ | CLERK'S JUDGMENT re: 26 Memorandum & Opinion in favor of Town of Highland, Town of Highland Zoning Board of Appeals against Yeshiva Ohr Shraga Veretzky. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated March 5, 2026, Defendants' motion to dismiss is GRANTED and Plaintiff's claims are dismissed without prejudice; accordingly, the case is closed. (Signed by Clerk of Court Tammi M Hellwig on 3/7/2026) (Attachments: # 1 Appeal Package) (km) (Entered: 03/07/2026) |
| | | | ☐ 0 Main Document     1 page     100.9 KB<br>☐ 1 Appeal Package     10 pages     428.1 KB |
| 03/11/2026 | 28 | ☐ | NOTICE OF APPEAL from 26 Memorandum & Opinion,, 27 Clerk's Judgment,,. Document filed by Yeshiva Ohr Shraga Veretzky. Filing fee $ 605.00, receipt number ANYSDC-32530912. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Barshov, Steven) Modified on 3/12/2026 (nd). (Entered: 03/11/2026) |
| 03/12/2026 | | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 28 Notice of Appeal,..(nd) (Entered: 03/12/2026) |
| 03/12/2026 | | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 28 Notice of Appeal, filed by Yeshiva Ohr Shraga Veretzky were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/12/2026) |

[View Selected]

or

[Download Selected]

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/10/2026 10:30:47 | | | |
| **PACER Login:** | blandy33 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:24-cv-08477-CS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### SOUTHERN DISTRICT OF NEW ▼

| | |
|---|---|
| YESHIVA OHR SHRAGA VERETZKY<br><br>_____<br>*Plaintiff(s)*<br>v.<br>TOWN OF HIGHLAND ZONING BOARD OF APPEALS; TOWN OF HIGHLAND PLANNING BOARD; TOWN BOARD OF THE TOWN OF HIGHLAND, AND TOWN OF HIGHLAND<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 7:24-cv-08477-CS |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   TOWN OF HIGHLAND ZONING BOARD OF APPEALS
TOWN OF HIGHLAND PLANNING BOARD
TOWN BOARD OF THE TOWN OF HIGHLAND
TOWN OF HIGHLAND
4 Proctor Road
Eldred, NY 12732

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Steven Barshov
SBarshovLaw PLLC
20 Lagoon Lane
Haverstraw, N.Y. 10927

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: __November 12, 2024__          _____
                                         /S/  S.  James
                                    *Signature of Clerk or Deputy Clerk*

Case 7:24-cv-08477-CS    Document 5    Filed 11/12/24    Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                          *Server's signature*


                                             _____
                                                          *Printed name and title*



                                             _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

Case 7:24-cv-08477-CS     Document 12     Filed 03/31/25     Page 1 of 41

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
YESHIVA OHR SHRAGA VERETZKY,

                      Plaintiff,

    v.

TOWN OF HIGHLAND ZONING BOARD
OF APPEALS and TOWN OF HIGHLAND,

                    Defendants.
--------------------------------------------------------- X

Civil Action No. 7:24-cv-8477

**FIRST AMENDED VERIFIED**
**COMPLAINT FOR DECLARATORY**
**JUDGMENT AND INJUNCTIVE**
**RELIEF**

COMES NOW, Yeshiva Ohr Shraga Veretzky (the "Yeshiva"), by and through its counsel,

SBarshovLaw PLLC, and for its complaint states as follows:

**INTRODUCTION**

1.      This is an action to redress violations of the Yeshiva's constitutional and civil rights

under (a) the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") 42 U.S.C

§ 2000cc, *et seq.*; (a) the First and Fourteenth Amendments to the United Sates Constitution as

enforced by 42 U.S.C. §§ 1983 and 1988; and (c) Article 1, §§ 3, 9 and 11 of the New York

Constitution.

2.      The Yeshiva filed an application with the Town of Highland Planning Board (the

"Planning Board") for a special permit as a place of worship to provide religious education during

the summer months.  Ultimately, the Planning Board referred the application to the Town of

Highland Zoning Board of Appeals (the "ZBA") for an interpretation as to whether the Yeshiva's

proposed summer use of the property located at 211 Mail Road, Barryville, New York (the

"Property") qualified as a religious use and place of worship under the applicable zoning of the

Town of Highland (the "Town").  The ZBA is the only body authorized by law to interpret the

Town's zoning and the ZBA issued a final interpretation that the Yeshiva's proposed summer

1

religious educational use is not a religious use, but a summer camp use which is not a permitted use under the Property's R-2 zoning.

3.      The proposed summer use religious use would be the religious education of high school aged students who would be present at the Property without their families, as well as younger children of the Yeshiva staff who would also reside at the Property during the summer months. The religious education would be a continuation of the same education the students receive during the non-summer months and would be provided by the same Rabbis who teach them during the non-summer months.  They would simply shift the location of their religious education to the Property during the summer months

4.      The ZBA interpretation prohibiting religious educational use of the Property in the summer months:

(a) places an unreasonable limitation on religious use and assembly in violation of the Unreasonable Limitations provision of RLUIPA, 42 U.S.C. 2000cc(b)(3)(B); and

(b) imposes a substantial burden on the Yeshiva in violation of RLUIPA, 42 U.S.C. 2000cc(a)(1).

5.      The ZBA interpretation prohibiting religious educational use of the Property in the summer months unlawfully restricts the Yeshiva's exercise of religion in violation of the First and Fourteenth Amendments of the United States Constitution, as enforced by 42 U.S.C. §§ 1983 and 1985.

6.      As interpreted by the ZBA, both on its face and as applied, the Town's zoning code imposes burdens on and prohibits religious educational use of the Property while similar intensity and types of nonreligious uses are allowed in violation of the "Equal Terms" provision of RLUIPA, 42 U.S.C. 2000cc(b)(l) and in violation of Equal Protection Clause of the Fourteenth Amendment

2

of the United States Constitution, as enforced by 42 U.S.C. § 1983.

7.    In addition, Defendants have also violated the Yeshiva's state constitutional protected rights, including New York State Constitution Article I, § 3 (religious freedom); Article I, § 9 (right to assemble), and Article 1, § 11 (equal protection and prohibition against discrimination in civil rights).

**PARTIES**

8.    Plaintiff Yeshiva Ohr Shraga Veretzky is a New York State religious corporation providing religious education and, through a not-for-profit religious corporate affiliate, is the owner of the Property.  The principal office of the Yeshiva is at 1102 Ave. L, Brooklyn, New York.

9.    The Town of Highland Zoning Board of Appeals is the duly constituted Zoning Board of Appeals of the Town of Highland, organized and existing pursuant to the laws of the State of New York

10.    The Town of Highland is a lawfully formed township in Sullivan County, New York.

**JURISDICTION AND VENUE**

11.    Subject matter jurisdiction over this action is conferred upon this Court as provided in: 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); and 28 U.S.C. § 1367 (supplemental jurisdiction).

12.    Personal jurisdiction over this action is conferred upon this Court because Defendants are located in the Southern District of New York and because the acts complained of occurred in this District.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants are located in the Southern District of New York and because the events giving rise to

3

this litigation occurred in this District.

## STATEMENT OF FACTS

A.    Background and Property Acquisition

14.    The Yeshiva has religious schools and related facilities in both Brooklyn, New York and Lakewood, New Jersey. For a number of years, the Yeshiva leased facilities in Sullivan County to provide a place where its Rabbis and students from both Brooklyn and Lakewood could come together and continue their religious education in the summer months.

15.    During the non-summer months, the Yeshiva sponsored or co-sponsored religious retreats and other religious activities at locations that it rented for such purposes. In addition, Rabbis affiliated with the Yeshiva and its students and their families also attended such events and religious retreats sponsored by other Rabbis and other religious organizations.

16.    The Yeshiva began a search for property that was already improved with buildings that could be adapted and used for religious education of the Yeshiva's students in the summer months, and as a religious retreat in the non-summer months.

17.    The Yeshiva became aware of the Property which was owned by 211 Mail Road LLC and operated as a commercial hotel pursuant to a special use permit issued by the Planning Board.

18.    Initially, an application for a special use permit to allow the religious use of the Property was filed when the Property was owned by 211 Mail Road LLC and with that owner's consent. Ultimately, the Yeshiva completed the purchase of the Property through a single-purpose affiliated not-for-profit religious entity.

B.    The Zoning Code's Provisions and the Special Use Permit Application

19.    The Town Zoning Code is codified as Chapter 190 of the Town Code of the Town

4

of Highland (the "Zoning Code"). The Property is mapped within the Town's Residential Agricultural R-2 Zoning District.

20.    The Zoning Code's District Schedule of Use Regulations designates a "place of worship" as a use of property that requires a special use permit in the R-2 Zoning District.  A true and correct copy of the Zoning Code's District Schedule of Use Regulations is appended as Exhibit A.  As further confirmed in the District Schedule of Use Regulations, a place of worship is a specially permitted use in every zoning district in the Town, meaning that a place of worship is specially permitted everywhere in the Town.

21.    Zoning Code § 190-7 is entitled "Definitions" and contains no definition of a place of worship, house of worship, synagogue, church, temple or any similar term.  Because there is no definition of a place of worship in the Zoning Code and because a "place of worship" is allowed everywhere in the Town, religious use of property is specially permitted throughout the Town, including at the Property.

22.    Religious education is a part of religious use of property and wherever a place of worship is specially permitted under local zoning, so is the use of the property for religious education, subject to issuance of a special use permit.

23.    The Yeshiva filed a preliminary application with the Planning Board in February 2023 for a special use permit for a place of worship.  The preliminary special use permit application was for the adaptive re-use of the Property's existing buildings and the construction of new buildings for the Yeshiva's proposed use of the Property for religious education in the summer months and as a religious retreat during the non-summer months.  Appended as Exhibits B and C are true and correct copies of the February 2023 special use permit preliminary application packet. Exhibit B includes: the special use permit application form and the environmental assessment form

5

(EAF) submitted pursuant to the New York State Environmental Quality Review Act (SEQRA). Exhibit C contains the sketch site plan of the Property showing existing and proposed buildings, structures, and improvements.

24.     The preliminary special use permit application proposed four new single story buildings containing the following: (a) a Shul (synagogue) area for prayer and conducting of religious services for those persons who are at the Property for religious education or religious retreat; (b) a Mikva (ritual bath); (c) spaces for religious lectures and study, prayer, and for meetings and gatherings of those who are at the Property; and (d) sleeping accommodations for 32 Yeshiva students;

25.     In the summer months, principally July and Augst, teenagers and young adults from both the Yeshiva's Brooklyn and Lakewood facilities would come to and reside at the Property to study Talmud, communicate and study with their Rabbis, deepen their religious faith, and connect on a religious level with others within the Yeshiva's religious community.

26.     During these summer months, those receiving religious education would receive the same religious education from the same Rabbis who educate them during the non-summer months.  In addition, younger children of Rabbis and other staff present at the Property would also receive religious education during the summer months.

C.     For Orthodox Jews, Religious Education is Religious Use

27.     Religious education is one of the most important elements of Orthodox Jewish life. To the Orthodox Jewish community, religious education of their children is divinely mandated and has been for literally thousands of years.  For the Orthodox Jewish community, students are divinely commanded to learn and Rabbis are commanded to teach.  That is one reason why the word Rabbi, translated literally, means teacher.

28.    For Orthodox Jews there is no separation between religion and education. From the youngest age children are taught Torah (the Bible, a/ka the Five Books of Moses, a/k/a the Old Testament) and the Talmud, which is the "magnum opus" of Jewish religious teachings and commentary.

29.    The Talmud consists of two parts. First, is the Mishnah which consists of the oldest commentaries on the Torah. Beginning at least approximately 2500 years ago, Torah was orally read, taught, discussed, and commented upon, principally by Rabbis residing in Jerusalem and in what is now Iraq. That oral body of knowledge, which was handed down verbally from one generation of Rabbinical scholars to the next, is the Mishnah.

30.    With the destruction of the Second Temple by the Romans, the Jewish diaspora began. Fearful that the spread of Jews throughout the world would make oral transmission of the Mishnah impossible, one Rabbi alive toward the end of the Second Century, C.E., put the Mishnah into written form. That written version of the Mishnah is what has been studied and taught for the past approximately 1700 years.

31.    The second part of the Talmud is the Gemara. The Gemara is approximately 2700 two-sided pages of written commentary on the Mishnah by Rabbinical scholars including Rashi, Maimonides, and many others.

32.    The Torah itself is divided into 54 sections or "Parshas" which are read one per week on the Sabbath so that the entirety of the Torah is read each year (the Jewish calendar year is lunar and has 54 weeks). The same Parsha that is read during Sabbath services forms the basis for discussion in the classroom each week, as well as between parents and children, including at Sabbath dinner. Thus, the same Parsha that is a core part of the weekly Sabbath religious service is also a core part of the religious education that week.

7

33.    Similar to "Rabbi" meaning teacher, Torah means "instruction" or "teaching." And Mishnah's literal translation is "study by repetition" – in part a reference to the original oral transmission of the Mishnah from generation to generation. Many other examples could be given, but they all confirm that there is no separation between Jewish education and Jewish religion. Religious education is just as integral to Jewish religion as is prayer. Put simply, Jews are divinely commanded to religiously educate their children just as they are divinely commanded to pray.

D.    Planning Board Review of the Preliminary Application

34.    The Planning Board acknowledged receipt of the preliminary application at its March 22, 2023 meeting, as confirmed in the minutes of that meeting, a true and correct copy of which is appended as Exhibit D. Included as part of the meeting minutes was a memorandum dated March 20, 2023 from Kevin Schwensfeier, Senior Planner at the Laberge Group to the Planning Board's counsel, Michael Davidoff, Esq. (the "Laberge Memo"). The Laberge Group is an environmental and planning consultant to the Planning Board.

35.    The Laberge Memo was delivered to the Yeshiva's representatives at the Planning Board's March 22, 2023 meeting. The Laberge Memo included the following:

- Religious Retreat is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.
- Dormitory is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.
- Mikvah, while not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations, is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.
- Multi-purpose building while not specifically listed is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.

8

36.     Having been presented with the Laberge Memo for the first time at the Planning Board's March 22, 2023 meeting, counsel for the Yeshiva requested and received permission to respond to the Laberge Memo, as confirmed in the meeting minutes.

37.     The Laberge Group was either unaware of or did not understand the applicable decisional law regarding religious educational use, especially *Yeshiva Talmud Torah Ohr Moshe v. Zoning Board of Appeals of The Town of Wawarsing* ("*Talmud Torah*") 170 A.D.3d 1488 (3d Dept. 2019).  In *Talmud Torah*, the New York State Appellate Division, Third Department, rejected the precise distinctions articulated by the Laberge Group and held that summer religious education was "religious use" under local zoning and all of the component parts of that religious educational use (including sleeping accommodations, classrooms, etc.) were all allowed within the umbrella of the religious use of a place or house of worship.

38.     To inform the Planning Board and its consultants of the applicable law regarding religious use, including *Talmud Torah* and other decisional law confirming that religious education is a part of religious use, counsel for the Yeshiva prepared and submitted a Memorandum of Law to the Planning Board on April 27, 2023 (the "Religious Use MOL"), a true and correct copy of which is appended as Exhibit E.

39.     The Religious Use MOL confirmed to the Planning Board that religious education is a part of religious use under New York law and that this rule of law has been recognized and upheld in an unbroken line of judicial decisions law for more than fifty years.  The Religious Use MOL further confirmed to the Planning Board that RLUIPA prohibits units of local government from applying zoning and land use laws to unduly burden the exercise of religion, which includes religious education. The Religious Use MOL delineated precisely why the Application's proposed summer religious educational use and non-summer religious retreat uses would fall within the

9

religious uses authorized for a place of worship.

40.     Following submission of the Religious Use MOL, the matter was placed on the agenda for the Planning Board's June 28, 2023 meeting.  Prior to that meeting, both the Laberge Group and the Town Engineer, Fusco Engineering, submitted additional comments, taking into account the Religious Use MOL.  Appended as Exhibit F is a true and correct copy of the relevant excerpts from the Planning Board meeting minutes, as well as the comment letter from Fusco Engineering (the "Fusco 06-26-2023 Comment Letter") and the Laberge Group Memorandum (the "Laberge 05-24-2023 Memorandum").

41.     The Fusco 06-26-2023 Comment Letter correctly confirmed that both religious education and a religious retreat were encompassed within the special use permit for a place of worship, stating as follows:

1. Under Chapter 190, Schedule 2, District Schedule of Use Regulations R2 District:
   a. Hotel/Motel is listed as Special Use Permit and is required.
   b. Multi-Purpose building is not specifically listed in R2 but is part of Hotel/Motel and part of Special Use Permit (SUP).
   c. <u>Place of Worship is listed in R2 and require a Special Use Permit from the Planning Board. This would also include the Mikvah, Religious Retreat, and religious education.</u>
2. The above shows that this project can be considered by the Planning Board as a combination of Special User Permits; mainly due to the Place of Worship designation and the New York State and Federal RLUIPA 2000 legislat[ion]. The Planning Board must determine carefully if the Place of Worship and religious education are the basis of the application.

Exhibit F, Fusco 06-26-2023 Comment Letter at 2 (emphasis added).  Neither the Planning Board's counsel nor any Planning Board member questioned or took issue with the emphasized text in Fusco 06--26-2023 Comment Letter and the Yeshiva relied on the text of the Comment Letter and moved forward with the special permit application process before the Planning Board.

42.    The Laberge Group modified its prior position, including acknowledging that a religious retreat "may be included in the generic class of "Place of Worship" with additional information for the Planning Board to determine." *See* Exhibit F, Laberge 05-24-2023 Memorandum at 2.

43.    The Yeshiva's preapplication was before the Planning Board at its August 23, 2023 meeting. Appended as Exhibit G is a true and correct copy of the relevant excerpts from the Planning Board minutes, as well as an additional comment letter from Fusco Engineering (the "Fusco 08-21-2023 Comment Letter"). In addition to a number of technical comments on the proposed site plan, Fusco repeated verbatim the text from the Fusco 06-26-2023 Comment Letter quoted above in paragraph 41, thus reconfirming Fusco's position that religious education was a use included within the specially permitted "place of worship." No one contradicted or questioned this statement in the Fusco 08-21-2023 Comment Letter, including the Planning Board's counsel, any member of the Planning Board, or anyone at Laberge.

44.    Again relying upon the uncontradicted statement in the Fusco 08-21-2023 Comment Letter regarding the Yeshiva's proposed religious educational use being eligible for a special permit as place of worship, Fuller Engineering prepared and submitted revised plans on behalf of the Yeshiva which were reviewed by Fusco Engineering. Those plans did not change the proposed religious educational use of the Property in the summer months and the religious retreat in the non-summer months.

45.    The special application was considered by the Planning Board at its meeting of October 25, 2023. At that meeting, Laura Burrell, who was at that time both a candidate for the Town Board and an alternate Planning Board member, sat in for absent Planning Board member Steve Bott. Appended as Exhibit H is a true and correct copy of the relevant excerpts from the

11

October 25, 2023 Planning Board minutes.

46.    Fusco Engineering submitted a comment letter, dated October 23, 2023, addressing the most recent submissions from John Fuller (the "Fusco 10-23-2023 Comment Letter"), a copy of which is appended to the Planning Board minutes in Exhibit H.  In the Fusco 10-23-2023 Comment Letter, Fusco Engineering again repeated verbatim the same language regarding the proposed uses of the Property as it had stated in the prior Fusco 08-21-23 and 06-26-2023 Comment Letters, as initially quoted in Paragraph 41, *supra*.

47.    In addition, the October 25, 2023 meeting minutes confirm that the Planning Board understood that the proposed use of the Property was for religious use all year round:  religious education in the summer and religious retreat in the non-summer months, all to be special permitted as a religious place of worship.  The meeting minutes state that Planning Board member Spitz received "clarification that the applicant is looking to change the existing special use of Hotel/Motel/Restaurant to a religious place of worship." *See* Exhibit H.

E.    The Town Board Election

48.    In November 2023, the general election was conducted for Town elected officials. Alternate Planning Board member, Laura Burrell, was a candidate for the Town Board.

49.    At the November 2023 general election, the incumbent Town Supervisor was not re-elected. John Pizzolato was elected Town Supervisor, and Laura Burrell and Tom Migliorino were elected to the Town Board.  Thus, a majority of the Town Board, including the Town Supervisor, were newly elected.

F.    The Formal Yeshiva Application

50.    On November 17, 2023, revised application documents were submitted to the Planning Board.  Appended as Exhibit I is a true and correct memorandum from the Yeshiva's

counsel addressing in detail the proposed year-round religious use of the Property (the "11-17-2023 Religious Use Memo"). The 11-17-2023 Religious Use Memo stated as follows:

> The approvals sought from the Panning Board are for the following uses:
>
> A.. In the summer months the CMR Property would be used as religious educational retreat for the Yeshiva. In the summer months, Hasidic young adults, children, and families will come to the Site to study Torah, communicate and study with their Rabbi, deepen their religious faith, and connect on a religious level with others of their religious community.
>
> B. In the non-summer months, the CMR Property would be utilized as a religious retreat for groups of different sizes who desire to utilize the Property for religious purposes. The CMR Property would not be open to the general public as a commercial hotel and the general public would not be able to make reservations or book accommodations to stay at the CMR Property as they would with any commercial hotel. Those coming to the utilize the CMR Property would be doing so for religious purposes through a group that would be using all or a portion of the CMR Property for such a religious purpose.

Exhibit I, 11-17-2023 Religious Use Memo at 1.

51. CMR is short for Catskill Mountain Resort, the name of the Property under its previous commercial ownership. As of November 2023, the Property was still owned by its prior commercial owners and so is referred to in the 11-17-2023 Religious Use Memo as the CMR Property. Soon after the submission of the 11-17-2023 Religious Use Memo, the Yeshiva's affiliate closed on the purchase of the Property.

52. The 11-17-2023 Religious Use Memo provided details about how each of the buildings in the Property would be utilized, as well as how the use of each building would contribute to the religious use of the Property. The 11-17-2023 Religious Use Memo restated the uses that had been previously articulated in application submissions, including the Religious Use MOL. In that regard, the 11-17-2023 Religious Use Memo reconfirmed the following:

> During the non-summer months, groups of different sizes would

13

> come to the CMR Property for religious programs, to gather for religious holidays, etc. Those participating would sleep at accommodations on-site. In the summer months, the CMR Property would be used as a religious educational retreat for students. Groups of students may also come to the CMR Property at other times of the year for weekends or for holiday observances. The CMR Property would not be operated as a commercial hotel.
>
> During the summer months, students would arrive by bus and remain on-site for the remainder of the summer. Staff would also reside on-site for the summer.

Exhibit I, 11-17-2023 Religious Use Memo at 2.

53.    Also on November 17, 2023, the Yeshiva's engineer, Mr. Fuller, submitted additional application materials. Appended as Exhibit J is a true and correct copy of the letter from the Yeshiva's engineer responding to multiple technical comments from the Town Engineer.

54.    Appended as Exhibit K is a true and correct copy of the complete stamped site plan submitted to the Planning Board. In addition, a Stormwater Pollution Prevention Plan was also submitted by the Yeshiva's engineer.

55.    With all of the November 2023 Planning Board submissions, in addition to what had been previously submitted to the Planning Board, a complete special use permit application and supporting materials for a place of worship was before the Planning Board.

56.    The Planning Board next met on November 29, 2023. Laura Burrell, who had been elected to the Town Board but had not yet taken office, attended the meeting as an alternate Planning Board member sitting in place of absent member Tim McKenna. A true and correct copy of relevant excerpts of the Planning Board 11-29-2023 Minutes are appended as Exhibit L. During the Planning Board meeting, the Board acknowledged receipt of the Yeshiva's 11-17-2023 submissions and authorized direct contact with the Town Engineer by the Yeshiva's representatives "in the hope to schedule a public hearing at the December meeting."

14

57.     Between the November and December Planning Board meetings the Yeshiva's engineer, John Fuller, worked with the Town Engineer to address any open technical issues, which was accomplished.

58.     The Planning Board next met on December 20, 2023 and John Fuller was in attendance. At that meeting, Mr. Fuller confirmed that technical issues had been resolved with the Town's consultants and he requested that the Planning Board find that the Yeshiva's application was complete and schedule a public hearing.

59.     Newly elected Town Board member and Planning Board alternate Laura Burrell attended the Planning Board's December 20, 2023 meeting, again sitting in for absent member Tim McKenna. Planning Board counsel Michael Davidoff was not present at the meeting as he was either no longer counsel to the Planning Board or he was about to no longer be the Planning Board's counsel. *See* the relevant excerpts of the Planning Board's December 20, 2023 Minutes, a true and correct copy of which is appended as Exhibit M.

60.     At the December Planning Board meeting, at least one Planning Board member expressed hostility to Mr. Fuller about the Yeshiva, with one Planning Board member accusing its Rabbi, Sholom Landau, of being prejudiced. That exchange with the Yeshiva's representative, Mr. Fuller, is inexplicably omitted from the Planning Board minutes.

G.     The New Town Board Convenes and Retains New Counsel

61.     The new Town Supervisor and new Town Board members were sworn in on January 2, 2024. A true and correct copy of the Town Board minutes of January 2, 2024 are appended as Exhibit N. The Town Board minutes state that candidates for Town Attorney were being interviewed. Given that this meeting occurred on January 2, 2024 and it states that candidates were being interviewed, the process of selecting a new Town Attorney began at some point in

15

2023.

62.    On January 4, 2024, a special Town Board meeting was held. As stated in the Town Board Meeting Minutes, a true and correct copy of which are appended as Exhibit O, "The purpose of this meeting is to appoint an attorney for the town. There was a dispute at the Town Board as to whether its process for retaining the Town Attorney complied with the Open Meetings Law. The new Town Supervisor stated state that the Town Attorney position was never posted, but that "three very qualified applicants reached out to us." The Supervisor continued by saying that "there was a general familiarity with the majority of the applicants with myself and Laura and with you, Jim. Tom got to know Steve Mogel." Exhibit O, Minutes at p. 1.

63.    The Town Supervisor further stated:  Jim and I in full disclosure have worked with Steve Mogel before. . . Laura knows of hm from that experience." Exhibit O, Minutes at p. 2.

64.    In describing what the Town Board was looking for in a Town Attorney, the Supervisor stated as follows:

> <u>We're looking for an at will attorney for the town. If we do not like the way that it's going, we can very easily change out the attorney</u> for the town if we don't feel that they have the skill set or they're showing some bias or they're not representing us in the way that we want to be represented. We can make a very simple motion to thank them and move on.

Exhibit O, Minutes at 2 (emphasis added). Thus, among the very first acts of the newly constituted Town Board in January 2024 was to replace the Town's counsel with an "at will" attorney who would serve solely at the Town Board's pleasure and would be counsel to the Town Board, the Planning Board and the ZBA

65.    After going into executive session, the Town Board voted to retain Mr. Steven Mogel, Esq. as counsel for the Town, which included being counsel for the Planning Board and the ZBA.

Case 7:24-cv-08477-CS     Document 12     Filed 03/31/25     Page 17 of 41

H.     Planning Board Referral to the ZBA

66.     In response to the statements made by Planning Board members at the December 2023 Planning Board Meeting, counsel for the Yeshiva wrote to the Planning Board on January 12, 2024 (the "1-12-2024 Barshov Letter"), a true and correct copy of which is appended as Exhibit P.     There, counsel stated that the Yeshiva's engineer reported that Planning Board members questioned whether the application was for a religious use.     Mr. Barshov reminded the Planning Board that these matters had been addressed in April 2023 and resubmitted the Religious Use MOL, Exhibit E.     Specifically, the Yeshiva's counsel stated:

> I write because it was reported to me by John Fuller that at the last Planning Board meeting certain Planning Board members questioned whether the application is for a religious use. This matter was addressed very early on in the process. A memorandum of law was submitted addressing this issue in April 2023 and neither the Planning Board nor your counsel took issue with the proposed religious use of the property or the contents of the memorandum of law. A copy that memorandum of law is re-submitted with this letter for your convenience.

Exhibit P, 1-12-2024 Barshov Letter at 1 (emphasis added).

67.     Counsel further stated that the proposed religious use was clear and if there was a question in that regard it should have been raised months earlier:

> If there was a question about the obvious religious use of the property, it should have been raised many months ago. For the reasons articulated in the memorandum of law, the case law is crystal clear that the proposed use of the property is religious in nature. Unless I hear otherwise from the Planning Board or its counsel, I will assume that the Planning Board will follow the law, not violate the Religious Land Use and Institutionalized Persons Act (RLUIPA), and continue to process the application as one for religious use.

*Id.*

68.     Counsel further responded to the strident and unfounded allegations that Rabbi Landau was in prejudiced in some way:

17

> Finally, it was also reported to me by John Fuller that one Planning Board member made negative statements about my client as being prejudiced in some way. As I was not present, I do not know exactly what was stated. However, Mr. Fuller reported that the remarks made were strident and quite negative. I caution the Planning Board that such comments manifest prejudgment of the application based on the privately held beliefs of this Planning Board member. Such prejudgment on the basis of privately held beliefs, which lack any factual basis in the application, is contrary to law. As your new attorney, Mr. Mogel, will no doubt advise the Planning Board, decisions on applications must be based on the facts and record made before the Planning Board. There has been no public hearing and it is clear that this Planning Board member has prejudged this application, which is not allowed.

> It is my hope that these matters will not be repeated and that the application will be fairly processed as a religious use without any prejudgment. I will be in attendance at the next Planning Board meeting and will address these matters in greater detail at that time should it be necessary.

*Id.* at pp. 1-2.

69.    No response from the Planning Board or its newly appointed counsel, Mr. Mogel, was issued to the 1-12-2024 Barshov Letter.

70.    The next meeting of the Planning Board occurred on January 24, 2024. A true and correct copy of the Planning Board minutes is appended as Exhibit Q. As is discussed in detail, *infra*, the appended copy is an accurate copy of the Planning Board's minutes, but the minutes themselves are erroneous and incomplete.

71.    At the Planning Board's January 2024 meeting, new Town counsel, Steven Mogel, Esq., was in attendance. The Yeshiva's counsel was present and requested again that a public hearing be set on the Yeshiva's special permit application.

72.    Planning Board members asked questions about the proposed religious use of the Property, which were responded to by the Yeshiva's counsel, including reminding the Planning Board that a detailed memorandum of law addressing the proposed religious use had been

submitted in April 2023 (the Religious Use MOL, Exhibit E), and in the 11-17-2023 Religious Use Memo, Exhibit I, as well as restated orally to the Planning Board, to wit: that the proposed use of the Property would be for religious educational use for the Yeshiva's students and the children of the Yeshiva's staff during the summer months, and as a religious retreat during the balance of the year.

73.    The Planning Board minutes incorrectly state the following: "The application has not stated specifically the use intended." Exhibit Q, Planning Board Meeting Minutes January 24, 2024, p.3. The 11-17-2023 Religious Use Memo addressed both the specific proposed use of the Property, as well as the use of all of the existing and proposed buildings and facilities.

74.    After the Yeshiva's counsel reiterated yet again to the Planning Board the Yeshiva's proposed religious educational use of the Property in the summer months and the proposed religious retreat uses during the balance of the year, the Planning Board's new counsel verbally suggested that the Planning Board refer the application to the ZBA for an interpretation as to whether the Yeshiva's proposed use was religious. This was obviously prearranged, as the Planning Board immediately voted to make that referral with virtually no discussion whatsoever. At that point, the Planning Board moved on to other applications and matters before it.

75.    The minutes of the Planning Board's January 24th meeting incorrectly state the following: "As per Steve Mogel, if the board cannot determine the use, the applicant can apply to the ZBA (Zoning Board of Appeals for a hearing." Exhibit Q, at pg. 3. There was never any statement made that the applicant could apply to the ZBA. Rather, the Planning Board's counsel suggested that the Planning Board itself could refer the application to the ZBA for an interpretation as to whether the proposed uses were religious in nature, which is precisely what the Planning Board did.

19

76.    On March 5, 2024, counsel for the Yeshiva wrote to the Planning Board and the ZBA reiterating that the Planning Board had itself voted to refer the Yeshiva's special permit application to the ZBA for an interpretation of the Town Zoning Code and that the ZBA was required to take up the referral without an application from the Yeshiva. A true and correct copy of the March 5, 2024 letter is appended as Exhibit R.

77.    No response was generated to the March 5, 2024 letter from the Yeshiva's counsel. The ZBA continued to refuse to recognize the referral from the Planning Board and the ZBA Secretary refused to place the matter on the ZBA agenda without an application from the Yeshiva.

78.    Thereupon, counsel to the Yeshiva wrote again to the Planning Board and the ZBA on March 20, 2024, a true and correct copy of which is appended as Exhibit S. In that letter the Yeshiva's counsel stated that the Yeshiva would not be forced to create a false administrative record by filing an interpretation application with the ZBA. Specifically, the Yeshiva's counsel stated as follows:

> As quoted above, the ZBA has made it crystal clear that it will not place this matter on its April agenda unless the Applicant files an application "requesting an interpretation of Use." <u>My client will not be forced to file any such application with the ZBA.</u> *My client will not be forced to create an administrative record that it is seeking a use interpretation when its position has consistently been that there is no ambiguity about its proposed religious use.* That was the position clearly communicated to the Planning Board in the Memorandum of Law I submitted to the Planning Board just shy of 11 months ago, in April 2023.

Exhibit S, March 20, 2024 Letter at 2 (underline in original; bold and italic emphasis added).

79.    The same day, Mr. Mogel finally acknowledged and confirmed that "the Planning Board referred this matter to the ZBA for an interpretation of use, the verbiage of the minutes and recent correspondence from the ZBA Chairman notwithstanding." Mr. Mogel further stated: "Your client is not requesting that this matter be put before the ZBA. Rather, your client was

20

referred to the ZBA by the Planning Board." A true and correct copy of Mr. Mogel's March 20, 2024 Letter is appended as Exhibit T. Thereafter the ZBA finally took up the referral from the Planning Board.

I.      The ZBA Interpretation

80.     The Yeshiva appeared before the ZBA on April 16, 2024. At that meeting the Yeshiva's counsel reiterated what had been stated in the Religious Use MOL (Exhibit E), and in the 11-17-2023 Religious Use Memo (Exhibit I), that the courts had uniformly held that the uses to be undertaken by the Yeshiva were religious uses. In addition, the ZBA was provided with the "Statement" issued by the United States Department of Justice (DOJ) in which the elements of religious use are delineated and discussed, especially as relates to RLUIPA (the "DOJ Statement"). The ZBA was informed that the Yeshiva's proposed summer religious educational use meets all of DOJ's criteria for religious use. Copies of these documents, as well as all of the judicial decisions referenced were provided to the ZBA. At the end of the ZBA's meeting, it scheduled a public hearing at its May meeting. A true and correct copy of the ZBA minutes of April 16, 2024 are appended as Exhibit U.

81.     At the ZBA's May 21, 2024 meeting, counsel for the Yeshiva presented the position of the Yeshiva that its proposed uses were all religious in nature and were authorized as a place of worship. A true and correct copy of the minutes of the ZBA's May 21, 2024 meeting is appended as Exhibit V.

82.     As stated in the ZBA's minutes, the following information and statements were made by the Yeshiva's counsel, the ZBA Chair, and the ZBA's Counsel, Mr. Mogel:

> [Mr. Barshov] reiterates that this is for Religious Use and states examples of this from other cases where there are many activities under this umbrella. He states that they want to use this property in the summertime to come en masse to continue religious education

> that was taught during the year. The rest of the year it would be used for religious retreats that would come up to the property and have whatever activities they need to provide during that time i.e. holiday, education, etc. Chairman asks Mr. Barshov to define "Place of Worship". Mr. Barshov explains that a Place of Worship is a place that religious uses is undertaken and is a full complex of religious uses. <u>Chairman asks Mr. Barshov if this definition is in other court cases and Mr. Barshov states that he has cited these cases. This is confirmed with Steve Mogul that we have these cases to review. Mr. Mogul confirms that these cases does give these broad terms</u>.

Exhibit V, ZBA May 21, 2024 Minutes at 4 (emphasis added).

83.    The meeting minutes do not accurately reflect the answer given when Mr. Mogel asked how the proposed summer use would be distinguished from a summer camp. The Yeshiva's counsel stated that the use would be religious education and that is what defines the use, not the fact that students stay there for the summer while being educated.

84.    The ZBA opened the public hearing. The ZBA's counsel stated that public comments should be confined to "the issue of the interpretation of the use of the property. Exhibit V, ZBA May 21, 2024 Minutes at 5. The comments from the public were directed to traffic concerns and similar matters not pertaining to whether the proposed summer use is or is not religious in nature. No public comment was received regarding religious use, but there was a vocal group of people present who used the public hearing as an opportunity to speak out forcefully against the Yeshiva receiving a special use permit from the Planning Board. Counsel for the Yeshiva stated at the conclusion of the oral comments that the matters brought up by the public would be addressed by the Planning Board as part of its review and had nothing to do with the interpretation question before the ZBA. Exhibit V, ZBA May 21, 2024 Minutes at 6.

85.    After closure of the public hearing, the ZBA did not engage in any discussion as to whether the proposed summer educational use would be a religious use approvable as a specially permitted place of worship.

86. The ZBA considered the matter again at its June 20, 2024 meeting. A true and correct copy of the ZBA minutes from its June 20, 2024 meeting is appended as Exhibit W. At that meeting Rabbi Landau discussed in great detail exactly how the Property would be configured and used. He detailed which groups of the Yeshiva's students would come from which of its schools (Brooklyn and Lakewood, NJ) and during which periods during the summer. He discussed how many staff would be at the Property during the summer educational use, and what type of staff they would be. *See* Exhibit W, ZBA 06-20-2024 Minutes at 3.

87. Rabbi Landau then described the physical arrangement of the Shul (synagogue) and places for study and other facilities, including the Mikvah. Rabbi Landau confirmed that the Yeshiva is ultra-orthodox. Rabbi Landau answered many other questions. *See* Exhibit W, ZBA 06-20-2024 Minutes at 3 -4.

88. The ZBA did not engage in any discussion at its June 20, 20204 meeting as to how to respond to the interpretation it was requested to issue. The ZBA tabled the matter until its next meeting without engaging in any substantive discussion regarding the interpretation of the Zoning Code which had been referred to the ZBA by the Planning Board. No motion was made by any ZBA member directing the ZBA's counsel to prepare a resolution of any kind.

89. The ZBA next met on July 18, 2024. A true and correct copy of the ZBA Minutes from its July 18, 2024 meeting is appended as Exhibit X. The meeting began with the ZBA's counsel handing to the ZBA Chair and the ZBA's members a previously prepared typed resolution. That previously prepared printed resolution was then read aloud by the ZBA Chair.

90. There was no opportunity for the Yeshiva's counsel or representatives to respond to, comment on, or utter a word concerning the written resolution. Instead, immediately following the reading of the written resolution, there was a motion made to adopt it. There was no discussion

of any kind by the members of the ZBA on the motion to adopt the resolution. The vote in favor of the motion to adopt the resolution was unanimous.

91.    The ZBA resolution set forth an interpretation that the proposed use of the Property in the summer was not religious, but was a "children's camp" under the Town of Highland Zoning Code, a use that is the ZBA stated "is expressly prohibited in the Town of Highland." Exhibit X, ZBA 07-18-2024 Minutes at 5.

92.    The ZBA interpretation was officially filed with the Highland Town Clerk on August 9, 2024, a true and correct copy of which is appended as Exhibit Y.

93.    By deeming the proposed summer religious use of the Property as not being a religious use and instead deeming it a "summer camp," the ZBA has rendered impossible any further proceedings before the Planning Board on the pending special permit application. The Planning Board is required by law to follow the ZBA interpretation and, as a matter of law is prohibited from issuing a special permit for a prohibited use. Therefore any further proceedings before the Planning Board on the special permit application for the summer religious educational use are not merely futile, they are impossible. *See Smith v. Town of Thompson Planning Board* ("*Smith*") 233 A.D.3d 1107 (3d Dept. 2024) holding that: (1) a town planning board is "without power to interpret the local zoning law;" (2) the power to interpret a town's zoning law is vested exclusively in the ZBA; and (3) "[w]ithout an appropriate zoning code interpretation in hand, the Planning Board could not properly issue a special use permit." *Id.* at 1110.

94.    Thus, by the ZBA issuing its interpretation that the proposed summer religious educational use is not recognized as a religious use under the Town of Highland Zoning Code and is to be treated as a summer camp, it is impossible for the Planning Board to grant the Yeshiva's pending application per *Smith*, *supra*. Thus, any further proceedings before the Planning Board

24

would be futile because the Planning Board lacks any power to grant a special permit for a use that the ZBA has determined is not permitted under the applicable zoning.

95.     Filing an application with the ZBA for a use variance would also be futile.  The ZBA is the only Town board authorized to interpret the Town Zoning Code and its interpretation is final.  As to the legal question of whether religious educational use is or is not a religious use under the Town Zoning Code, the factual record is complete.  A variance application would not provide any additional relevant or probative factual evidence because a use variance application is directed to an entirely different issue.  A use variance application assumes the illegality of the proposed use and is a request for permission to use property for such a prohibited purpose.  As to whether the Yeshiva's proposed use of the Property in the summer months qualifies as religious use and place of worship, the ZBA has issued a final and complete determination.

96.     The Yeshiva cannot be forced to apply for a use variance as a precondition of litigating whether the ZBA's interpretation has violated its rights under RLUIPA.  That process would not and cannot yield a result that is more "final" than the interpretation issued by the ZBA.  And even if the ZBA ultimately did choose to grant a use variance, permission to violate the Town Zoning Code is not the same as confirming the Yeshiva's right to utilize its property for religious purposes as a specially permitted use.  Under the guise of ripeness or finality, the Yeshiva cannot be forced to abandon the right to undertake a religious use which RLUIPA, the United States Constitution, and the New York State Constitution all guarantee.

97.     For all of the foregoing reasons, the claims attacking the illegality of the ZBA's interpretation of the Zoning Code as pled in this First Amended Verified Complaint are ripe and the ZBA's interpretation is final.  Accordingly, this Court has jurisdiction over Yeshiva's claims and there is neither a legal nor a prudential basis for dismissal on either ripeness or finality grounds.

25

## FIRST CAUSE OF ACTION

## VIOLATION OF RLUIPA

98.    All of the allegations set forth in paragraphs 1 through 97 are repeated as if fully set forth herein.

99.    Each of the Defendants is a governmental agency and a "government" for purposes of RLUIPA. *See* 42 U.S.C. § 2000cc(a)(1).

100.    The Plaintiff is a not-for-profit religious corporation with facilities in both New Jersey and Brooklyn, provides religious education for its students and undertakes other religious activities, and as such is a religious institution.  *See* 42 U.S.C. § 2000cc(a)(1).

101.    The Plaintiff provides Jewish Orthodox religious education for its students.  *See* 42 U.S.C. § 2000cc(a)(1).

102.    The interpretation of the Zoning Code issued by the ZBA constitutes an imposition or implementation of a land use regulation applicable to the Plaintiff. *See* 42 U.S.C. § 2000cc(a)(1).

103.    On its face and under applicable law, a "place of worship" as that term is used in the Zoning Code includes religious educational use, including religious educational use during summer months, as well as a religious retreat during the non-summer months.

104.    By interpreting the Zoning Code and the uses allowed as a "place of worship" to exclude religious educational use in the summer months, the ZBA has imposed a substantial burden on the Yeshiva.  *See* 42 U.S.C. § 2000cc(a)(1).  The interpretation prevents the Yeshiva from providing religious education to its students at the Property during the summer months.  The interpretation imposes a substantial burden, is not supported by any compelling governmental interest, and even if there was such compelling governmental interest, the interpretation is not the least restrictive means of achieving such an interest.

105.    This injury falls within the scope of RLUIPA because, in part, the substantial burden affects commerce among the several states, including because the Yeshiva is in both New Jersey and New York.  *See* 42 U.S.C. § 2000cc(a)(2)(B).

106.    This injury also falls within the scope of RLUIPA because the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which the Town makes, or has in place formal or informal procedures or practices that permit the Town to make, individualized assessments of the proposed uses for the property involved. See 42 U.S.C. § 2000cc(a)(2)(C).

107.    The ZBA interpretation violates the Equal Terms provision of RLUIPA by imposing and implementing an interpretation of the Town's land use regulations on terms that are less than equal to other specially permitted nonreligious gathering places, including but not limited to the prior commercial hotel use of the Property, as well as drinking establishments and restaurants . *See* 42 U.S.C. § 2000cc(b)(1).

108.    The ZBA interpretation also violates the Exclusion and Limits provision of RLUIPA by depriving the Yeshiva of its right to the free exercise of religion, by imposing and implementing land use regulations that unreasonably limit religious assemblies, institutions, or structures within the Town. See 42 U.S.C. § 2000cc(b)(3)(B).

109.    The Defendants were informed in submissions from the Yeshiva's counsel that a failure or refusal to treat the religious educational use as one of the uses specially permitted within a "place of worship" would be contrary to RLUIPA.

110.    RLUIPA, 42 U.S.C. § 2000cc-5(7), specifies that "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief. In addition, RLUIPA provides that the use, building, or conversion of real property for the purpose

of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose. *See also* 42 U.S.C. § 2000cc-3(g), providing that RLUIPA's provisions are to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."

111.    Congress did not specifically define the terms "religious institution" or "religious assembly." The federal courts have acknowledged the expansive scope of religious use under RLUIPA. For example, in *City Walk-Urban Mission Inc. v. Wakulla Cty. FL*, 471 F. Supp. 1268, 1282-83 (N.D. FL 2020), the District Court held that a church's use of property as a religious transition home to house and rehabilitate people in need, including registered sex offenders, constituted a religious use. *See also Church of the Hills of Township of Bedminster v. Township of Bedminster* ("*Church of the Hills*"), 2006 WL 462674, U.S.D.C. D. New Jersey, at *5. There the district court, quoting from the statute's legislative history, acknowledged that the ability of religious institutions to develop "a physical space adequate to their needs and consistent with their theological requirements is the "heart of the RLUIPA's land-use provisions," (citing 146 Cong. Rec. S7774-01, Joint Statement of Sen. Hatch and Sen. Kennedy on RLUIPA). *See also Congregational Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 424 (S.D.N.Y. 2015) (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).

112.    The Third Circuit Court of Appeals in *LeBoon v. Lancaster Jewish Community Center Ass'n* ("*LeBoon*"), 503 F.3d 217 (3rd Cir. 2007) enumerated nine factors to be applied in determining whether an entity and its proposed use are religious and these factors were accepted and applied by this Court in *Aparicio v. Christian Union, Inc.*, 2019 WL 1437618 at *4, *5 (S.D.N.Y 2019). These factors are as follows:

    (1)  whether the entity operates for a profit,
    (2)  whether it produces a secular product,

28

(3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose,

(4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue,

(5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees,

(6) whether the entity holds itself out to the public as secular or sectarian,

(7) whether the entity regularly includes prayer or other forms of worship in its activities,

(8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and

(9) whether its membership is made up by coreligionists.

*LeBoon*, 503 F.3d at 226.

113.    The Yeshiva's proposed summer religious educational use satisfies all nine factors. The summer religious educational use is an extension of the operations of Yeshiva Ohr Shraga Veretzky, which operates a Hasidic Orthodox Jewish Yeshiva in Brooklyn, New York and in Lakewood, New Jersey during the non-summer months. The Yeshiva does not operate for profit. Its organizational documents are religious in nature and have a religious purpose.  The Yeshiva holds itself out to the public as a religious organization and does not produce a secular product. The Yeshiva is affiliated with and financially supported by a synagogue.  The Yeshiva regularly includes prayer in its activities, as well as religious instruction.  It is entirely comprised of Hasidic Orthodox Jewish members.  The Yeshiva will be the sole user of the Property during the summer months for its summer religious educational use.

114.    Finally, the DOJ Statement acknowledges that the courts have applied RLUIPA to the following activities which were held to be religious assemblies and/or institutions: "individuals holding prayer meetings in their homes, religious schools, religious retreat centers, cemeteries, and

faith-based social services provided by religious entities. (DOJ Statement at 4 (emphasis added).)

115. Despite being advised that RLUIPA would be violated by the interpretation issued by the ZBA, nevertheless the ZBA issued the illegal interpretation.

116. The interpretation was issued by the ZBA because the Defendants do not want the Yeshiva to conduct Jewish religious education on the Property during the summer months.

117. Since places of worship are specially permitted Town-wide, there is no governmental interest that justifies the issuance of the interpretation and the burden that it places on the Yeshiva's exercise of religion and provision of religious education. There is certainly no compelling governmental interest.

118. Even if there was a compelling governmental interest, the interpretation issued by the ZBA is not the least compelling means of advancing that interest.

119. Since religious use as protected by RLUIPA includes religious educational use, the interpretation issued by the ZBA that the proposed summer religious educational use is not religious in nature is a violation of RLUIPA. The ZBA violated RLUIPA by interpretating the Zoning Code to exclude the Yeshiva's proposed summer religious educational use from eligibility for the specially permitted use as a place of worship.

120. Accordingly, this Court should rule that the ZBA's interpretation violated RLUIPA. On that basis, this Court should annul the ZBA interpretation; order the ZBA to issue an interpretation that is in accordance with RLUIPA; order the Planning Board to process the special permit application for a place of worship; award compensatory damages; and award reasonable attorney's fees and costs.

**SECOND CAUSE OF ACTION**

**VIOLATION OF RIGHT TO FREE EXERCISE OF RELIGION**

121.    All of the allegations set forth in paragraphs 1 through 97 are repeated as if fully set forth herein.

122.    The Yeshiva has a constitutional right under the First and Fourteenth Amendments to the United States Constitution to freely practice the Jewish religion, including the right to engage in the free exercise of religious Jewish education.

123.    The interpretation issued by the ZBA deprives the Yeshiva from exercising its constitutionally protected rights to the free exercise of the Jewish religion.  There is no compelling governmental interest justifying the abrogation of the Yeshiva's free exercise of religion.

124.    The Defendants acted under color of State Law when they deprived the Yeshiva of its constitutionally protected rights, in violation of 42 U.S.C. § 1983. Defendants acted knowingly and intentionally having been fully informed that the Yeshiva's proposed religious educational use of the Property was constitutionally protected and lawful.

125.    The Yeshiva has suffered injuries as a result of the deprivation of its constitutional free exercise rights, including being required to expend funds to find an alternate location for religious educational facilities, carrying costs for the Property including but not limited to real property taxes, and costs and expenses associated with proceedings before the Planning Board and ZBA to demonstrate that its proposed use of the Property for religious education is lawful.

126.    The Yeshiva is entitled to an Order holding that the ZBA interpretation violates the Yeshiva's constitutionally protected First and Fourteenth Amendment rights, and overturning the interpretation.  This Court should Order the Planning Board to process the special use permit application for religious educational use in the summer months, as well grant the Yeshiva

31

compensatory damages, as well as reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

## VIOLATION OF EQUAL PROTECTION OF THE LAWS

127. All of the allegations set forth in paragraphs 1 through 97 are repeated as if fully set forth herein.

128. The ZBA interpretation treats the Yeshiva's proposed religious educational use differently than similarly situated uses in violation of the Equal Protection Clause of the Fourteenth amendment of the United States Constitution.

129. All other religious uses and places of worship are allowed in all zoning districts in the Town. The ZBA interpretation prohibits the Yeshiva's proposed summer educational use and, accordingly, treats the Yeshiva's proposed religious educational use differently than all other religious uses.

130. The ZBA interpretation favor other religious uses over the Yeshiva's proposed Orthodox Jewish religious educational use and discriminates against the Yeshiva's proposed religious educational use.

131. The Defendants acted under color of State Law when they deprived the Yeshiva of its constitutionally protected rights, in violation of 42 U.S.C. § 1983. Defendants acted knowingly and intentionally having been fully informed that the Yeshiva's proposed religious educational use of the Property was constitutionally protected.

132. The Yeshiva has suffered injuries as a result of the deprivation of its constitutional free exercise rights, including being required to expend funds to find an alternate location for religious educational facilities, carrying costs for the Property including but not limited to real

property taxes, and costs and expenses associated with proceedings before the Planning Board and ZBA to demonstrate that its proposed use of the Property for religious education is lawful.

133.    The Yeshiva is entitled to an Order holding that the ZBA interpretation violates the Yeshiva's constitutionally protected First and Fourteenth Amendment rights, and overturning the interpretation.  This Court should Order the Planning Board to process the special use permit application for religious educational use in the summer months, as well grant the Yeshiva compensatory damages, as well as reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**

**NEW YORK STATE CONSTITUTION**

134.    All of the allegations set forth in paragraphs 1 through 97 are repeated as if fully set forth herein.

135.    The Defendants, by their acts under color of law, have violated the Yeshiva's rights under the New York State Constitution, including its right to freedom of worship and religious liberty, guaranteed by N.Y. Const. Article I, § 3; its right to assemble for religious purposes, guaranteed by N.Y. Const. Article I, § 9; and its rights to equal protection of the laws and to be protected against discrimination, guaranteed by N.Y. Const. Article I, § 11.

136.    The New York Courts have been quite clear that when used in a local zoning law, the terms "religious institution," religious use, or "place of worship" are legal matters and not ones that invoke the technical expertise of administrative boards, such as a zoning board of appeals or planning board.  For example, in *Talmud Torah, supra*,  the Wawarsing ZBA issued an interpretation that religious use did not include overnight residence during the summer months for religious educational purposes and that such use was a school or camp use. The Appellate Division

33

described the situation as follows:

> Respondent Municipal Code Officer issued a written determination that the planned use of the property was not a permitted use in an NS district because, although a place of worship constitutes an allowable use, a camp or any type of occupancy that permits overnight residence of students, staff or families is not allowable. Petitioner thereafter sought review of the Municipal Code Officer's determination by respondent Zoning Board of Appeals of the Town of Wawarsing (hereinafter ZBA), which affirmed the determination of the Municipal Code Officer and concluded that the proposed use of the property did not fall within the definition of place of worship but, instead, was "akin to a school or a camp," neither of which is a permitted use in an NS district.

*Id*. 170 A.D.3d at 1489.

137.    In adjudicating the appeal of the Wawarsing ZBA's interpretation of the Town of Wawarsing zoning law, the Appellate Division held that determining the meaning of the terms used in a zoning law was the province of the courts as a matter of law and that deference to an administrative board like the ZBA or the Planning Board is not required. *Id.* at 1489 – 90; *see also Raritan Dev. Corp. v. Silva*, 91 N.Y.2d 98, 102 (1997).

138.    The Highland Zoning Law does not contain a definition of "places of worship." Accordingly, the undefined term or phrase is to be given its plain or ordinary meaning. *See* McKinney's Statutes § 232 entitled "Words of ordinary import" and which provides as follows: "Words of ordinary import used in a statute are to be given their usual and commonly understood meaning, unless it is plain from the statute that a different meaning is intended." *See Sullivan v. Board of Zoning Appeals of Albany* ("*Sullivan*"), 144 A.D.3d 1480, 1482 (3d Dep't 2016) (holding that "[i]f the ordinance at issue does not define a particular term, courts will afford such term its plain or ordinary meaning, and any ambiguity in the language employed must be resolved in favor of the property owner."); *see also Talmud Torah*, 170 A.D.3d at 1489 (holding that a vague zoning

34

law is construed in favor of the property owner and against the municipality).

139.    Both the New York State and Federal Courts are very flexible in their interpretation of religious uses under local zoning ordinances. Given the absence of a definition of "places of worship" in the Highland Zoning Law, it must be interpreted by giving the phrase its ordinary meaning and with any ambiguity favoring the religious use of the Property.

140.    For more than 60 years, New York and Federal Courts have repeatedly opined on the scope of religious uses and activities and have consistently held that religious use should be construed broadly. The basic principles were enunciated by the New York Court of Appeals in *Matter of Community Synagogue v. Bates ("Bates")*, 1 N.Y.2d 445, 453 (1956), a case which arises under facts and circumstances quite similar to the ones presented in this litigation. In *Bates*, the petitioner applied for a permit to use its premises for a synagogue, Sunday school, and facilities for the use of the synagogue's social groups and community service activities. *Id.* at 448. The Village of Sands Point Zoning Board of Appeals concluded that the proposed uses were not for a church, because they were not all for worship and other similar uses. Essentially, the Sands Point ZBA parsed the activities allowing some, but finding others outside the scope of what they determined to be a religious use.

141.    Thus, in *Bates*, the New York Court of Appeals was required to address the nature and scope of religious use in the context of local zoning. The Court of Appeals held that the Sands Point ZBA's conception of what constituted a place of worship and religious use were unlawfully restrictive:

> [A] church is more than merely an edifice affording people the opportunity to worship God. <u>Strictly religious uses and activities are more than prayer and sacrifice and all churches recognize that the area of their responsibility is broader than leading the congregation in prayer.</u> Churches have always developed social groups for adults and youth where the fellowship of the congregation is strengthened

35

> with the result that the parent church is strengthened. . . . To limit a church to being merely a house of prayer and sacrifice would, in a large degree, be depriving the church of the opportunity of enlarging, perpetuating, and strengthening itself and the congregation.

*Bates*, 1 N.Y.2d at 453 (emphasis added).

142.    Following the principles enunciated in *Bates*, Federal and New York Courts have readily acknowledged that a very wide variety of facilities and functions are included within the broad definition of a church, synagogue, or other place of worship. In *Diocese of Rochester*, 1 N.Y.2d 508, 516 (1956), the Court of Appeals annulled a town planning board's denial of a permit for a proposed religious facility containing "[a] school; meeting room; kindergarten, small games, open field and hard-top play areas; and parking lot. . .". The Court of Appeals held that all such uses were fully encompassed within the definition of "church." The court, citing *Bates*, held that these uses were clearly "within the scope of a church's activities." *Id.* at 525.

143.    In *Sullivan, supra,* the Third Department upheld a zoning board's determination that a parsonage on a church's property in which the church planned to house homeless individuals was within the purview of a "house of worship." 144 A.D.3d at 1482. The applicable City of Albany zoning code defined "house of worship" as "[a] structure or part of a structure used for worship or religious ceremonies." *Id.* at 1481. In the absence of a specific statement as to what related uses might be contemplated by this definition, the court looked to the common law treatment of the term "house of worship" stemming from the Court of Appeals' decision in *Bates* and was "satisfied that the plain or ordinary meaning of 'house of worship' permits and encompasses the uses proposed by the church and Family Promise [the non-profit organization slated to run the parsonage]." *Id.* at 1482.

144.    In *Committee to Protect Overlook, Inc. v. Town of Woodstock Zoning Board of*

36

*Appeals*, the Third Department affirmed a zoning board decision that a proposed Tibetan monastery was a "church or other place of worship" and rejected the argument that certain proposed elements—such as bedrooms, a dining hall, office space, and a library—were "non-religious" and therefore not encompassed by the term "place of worship." 24 A.D.3d 1103, 1104 (3d Dep't 2005), *lv. to appeal denied*, 6 N.Y.3d 714 (2006). The Town of Woodstock zoning law did not define "church" or "place of worship," so the court looked to the broad common law definition of these terms. *Id.* Recognizing the project applicants' showing that "Buddhist practice . . . includes teachings and monastic retreats requiring residency at the monastery," the court found that the full extent of the proposed monastery, including the facilities petitioners argued were intended for "non-religious" uses, was encompassed within the definition of "place of worship." *Id.* at 1105.

145.    In *Faith for Today v. Murdock*, 11 A.D.2d 718, 719 (2d Dep't 1960), *aff'd* 9 N.Y.2d 761 (1961), the petitioner filed suit challenging the denial of its application for a permit to expand an existing religious facility. The Second Department held (and the Court of Appeals affirmed) that "modern office machinery and equipment" including a printing press for production of correspondence courses and a "dining room, kitchen, printing shop, [and] storage room" were all encompassed within the meaning of "church" use.

146.    In *Shaffer v. Temple Beth Emeth*, 198 A.D. 607, 609 (2d Dep't 1921), the Second Department evaluated the scope of the term "church" as used in a restrictive covenant. The court held that a building in addition to the proposed synagogue which was to include "an assembly room for Sabbath school children, [and] a gymnasium" also fell within the term "church." *Id.*

147.    In *In re Garden City Jewish Center*, 157 N.Y.S.2d 435 (Sup. Ct. Nassau Cty. 1956), the court applied *Bates* and held that a provision of a religious use permit that prohibited the use

of a religious facility for group activities other than religious services and Sunday School was unlawful in light of the broad definition of "church" use. In *Westbury Hebrew Cong. v. Downer*, 59 Misc.2d 387 (Sup. Ct. Nassau Cty. 1969), the court held that on-site classrooms used for teaching both religious and secular subjects fell within the scope of "synagogue" use, such that a separate non-public school use permit was not required. Similarly, in *Unitarian Universalist Church of Central Nassau v. Shorten*, 63 Misc.2d 978 (Sup. Ct. Nassau Cty. 1970), the court held that "operation of a day care is . . . well within the ambit of religious activity" that exemplifies a church use.

148.    Finally, and most recently, in *Talmud Torah* the Third Department determined that the Town of Wawarsing's definitions of religious use included and authorized the religious educational and other religious uses proposed. However, the Court further held that it would have reached the same conclusion even if the Town's zoning law definition had been ambiguous:

> We conclude that this definition unambiguously includes the living facilities proposed for students of the school, particularly in light of petitioner's representation that its purpose in constructing the facility is to provide religious instruction at a location with tranquil natural surroundings that facilitate reflection and study—a use that is consistent with a retreat house—and, thus, such facilities are permitted uses under the Town's zoning ordinance. <u>Moreover, had we found the definition ambiguous, we would have been required to resolve any ambiguity against respondents, especially in light of the flexibility required to be given to definitions of religious uses.</u>

*Talmud Torah*, 170 A.D.3d at 1490 (emphasis added).

149.    Predicated upon all of the foregoing authorities, there can be no doubt that a "place of worship" includes religious educational use during the summer months. Indeed, any doubt must be resolved in favor of religious use given the constitutionally protected status of religious use. Religious use is accorded a special status with respect to the application of zoning laws and such uses are considered "beneficial to the public welfare by their very nature." *Jewish*

*Reconstructionist Synagogue of North Shore, Inc.*, 38 N.Y.2d at 286; *see also Bates*, 1 N.Y.2d 445; *Matter of Diocese of Rochester v. Planning Bd. of Brighton*, 1 N.Y.2d 508 (1956).

150.    The "peculiarly pre-eminent status of religious institutions . . . for free exercise of religion remains an important factor" in zoning decisions pertaining to religious land uses. *Jewish Reconstructionist Synagogue*, 38 N.Y.2d at 288. Thus, although "religious institutions are not exempt from local zoning laws, greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made." *Gospel Faith Mission Int'l Inc. v. Weiss*, 112 A.D.3d 824, 825 (2d Dep't 2013).

151.    By issuing its interpretation, the ZBA ignored the applicable and settled decisional law in New York regarding religious use and deprived the Yeshiva of its constitutionally protected rights under the New York State Constitution, including its right to freedom of worship and religious liberty, guaranteed by N.Y. Const. Article I, § 3; its right to assemble for religious purposes, guaranteed by N.Y. Const. Article I, § 9; and its rights to equal protection of the laws and to be protected against discrimination, guaranteed by N.Y. Const. Article I, § 11.

<u>**RELIEF REQUESTED**</u>

WHEREFORE, the Yeshiva requests that the Court grant the following relief:

A.  Overturn and annul the ZBA's interpretation and issue a permanent injunction requiring the ZBA to interpret the Town Zoning Code as follows:  the Yeshiva's proposed religious educational use in the summer months is a specially permitted place of worship under the Town Zoning Code;

B.  An award of compensatory damages to the Yeshiva for the injuries caused by the Defendants as to each and every one of the causes of action pled, and if for any reason compensatory damages are not awarded, an award of nominal damages;

C.  An award of reasonable attorney's fees and costs of litigation as to all causes of action,

including pursuant to RLUIPA and 42 U.S.C. §§ 1983 and 1988; and

D.  Such other and additional relief as this Court deems just and appropriate.

Dated:  Haverstraw, New York
        March 31, 2025

                              SBarshovLaw PLLC

                              /s/ Steven Barshov_____
                              Steven Barshov, SB9809
                              *Attorney for Yeshiva Ohr Shraga Veretzky*
                              20 Lagoon Lane
                              Haverstraw, New York 10927
                              917-886-4328
                              sb@sbarshovlaw.com

Case 7:24-cv-08477-CS    Document 12    Filed 03/31/25    Page 41 of 41

## **VERIFICATION**

STATE OF NEW YORK     )
                                      ) ss.
COUNTY OF KINGS        )

Rabbi SHOLOM LANDAU, being first duly sworn, states under penalty of perjury that he has read the above FIRST AMENDED VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF and knows the contents thereof, and that the statements contained therein are true and correct to the best of his knowledge and belief.

_____
Sholom Landau

Subscribed and sworn to before me
by Sholom Landau this 31ˢᵗ day of
March, 2025

_____
Notary Public

CHAYA NEUMANN
Notary Public, State of New York
No. 01NE6124793
Qualified in Kings County
Commission Expires April 4, 2029

41

Case 7:24-cv-08477-CS     Document 12-1     Filed 03/31/25     Page 1 of 3

ZONING

*190 Attachment 3*

**Chapter 190 Schedule 2:**
**District Schedule of Use Regulations**
**Town of Highland, NY**

KEY:
  P - Permitted Use. Requires Site Plan Approval (unless otherwise noted)
  SUP - Special Use Permit Required
  NA - Not Allowed

| Uses[2] | H-C Hamlet Commercial (1-Acre Minimum) | R-1 Residential (2-Acre Minimum) | R-2 Residential Agricultural (3-Acre Minimum) | WLRD Washington Lake Resort District (3-Acre Minimum) |
|---|---|---|---|---|
| **Residential** | | | | |
| Dwelling, accessory | SUP | SUP | SUP | NA |
| Dwelling, one-family, on less than 15% slopes[1] | P | P | P | P |
| Dwelling, two-family, on less than 15% slopes[1] | P | P | P | P |
| Dwelling, one-family, on slopes 15% or greater[1,8] | SUP | SUP | SUP | SUP |
| Dwelling, two-family, on slopes 15% or greater[1,8] | SUP | SUP | SUP | SUP |
| Dwelling, multiple-family (not to exceed three units) | SUP | NA | NA | NA |
| Guest home | NA | SUP | SUP | SUP |
| Group home | SUP | SUP | SUP | NA |
| Home occupations | P | P | P | P |
| Manufactured homes[1] | P | P | P | P |
| Mixed commercial/residential dwelling | SUP | SUP | SUP | SUP |
| **General** | | | | |
| Accessory building, vacant lot | SUP | SUP | SUP | NA |
| Agriculture | P | P | P | P |
| Animal husbandry | P | P | P | P |
| Campgrounds | SUP | SUP | SUP | NA |
| Cemeteries | SUP | SUP | SUP | NA |
| Clearcutting (over 3 acres) | SUP | P | P | SUP |
| Construction activities, on slopes of 15% of greater[8] | SUP | SUP | SUP | SUP |
| Communication towers | SUP | SUP | SUP | NA |
| Commercial logging[4] | P | P | P | NA |
| Education institutions | SUP | NA | NA | NA |

Case 7:24-cv-08477-CS    Document 12-1    Filed 03/31/25    Page 2 of 3

HIGHLAND CODE

| Uses[2] | H-C Hamlet Commercial (1-Acre Minimum) | R-1 Residential (2-Acre Minimum) | R-2 Residential Agricultural (3-Acre Minimum) | WLRD Washington Lake Resort District (3-Acre Minimum) |
|---|---|---|---|---|
| Electric vehicle charging station | P | P | P | P |
| Farm markets, temporary | SUP | SUP | SUP | SUP |
| Fire house and emergency services | P | P | P | P |
| Forestry management[1] | P | P | P | P |
| Impervious surfaces greater than 10% of lot coverage | SUP | SUP | SUP | SUP |
| Places of worship | SUP | SUP | SUP | SUP |
| Public utility structures and facilities | SUP | SUP | SUP | SUP |
| Public parks and recreation | SUP | SUP | SUP | SUP |
| Solar, large-scale/utility-scale | SUP | SUP | SUP | SUP |
| Solar, small-scale | P | P | P | P |
| Wind energy conversion system, small-scale | NA | SUP | SUP | SUP |
| **Business/Commercial** | | | | |
| Adult-oriented business[3] | SUP | NA | NA | NA |
| Automotive repair shops | SUP | SUP | NA | NA |
| Automotive sales and service | SUP | NA | NA | NA |
| Bed-and-breakfast establishments | SUP | P | P | SUP |
| Boat livery | SUP | SUP | SUP | SUP |
| Bowling alley | SUP | NA | NA | NA |
| Business and professional offices | P | SUP | SUP | SUP |
| Car wash | SUP | NA | NA | NA |
| Drinking establishments | P | SUP | SUP | P |
| Farm brewery | SUP | SUP | SUP | NA |
| Game of chance establishment[7] | SUP | NA | NA | SUP |
| Golf course | NA | NA | SUP | NA |
| Hotel/motel | SUP | SUP | SUP | SUP |
| Kennels | NA | SUP | SUP | NA |
| Medical facilities | SUP | NA | NA | NA |
| Quarrying, 750 cubic yards or less per year | P | P | P | P |
| Repair shops, small engine | SUP | SUP | SUP | NA |
| Restaurants[6] | P | SUP | SUP | P |
| Retail stores | P | NA | NA | SUP |
| Sawmills | SUP | SUP | SUP | NA |
| Short-term rental[2] | P | P | P | P |
| Service establishments | P | SUP | SUP | SUP |
| Stables, commercial[5] | SUP | SUP | SUP | SUP |

Case 7:24-cv-08477-CS     Document 12-1     Filed 03/31/25     Page 3 of 3

ZONING

| Uses[2] | H-C Hamlet Commercial (1-Acre Minimum) | R-1 Residential (2-Acre Minimum) | R-2 Residential Agricultural (3-Acre Minimum) | WLRD Washington Lake Resort District (3-Acre Minimum) |
|---|---|---|---|---|
| **Accessory Uses** | | | | |
| Carport[1] | P | P | P | P |
| Electric vehicle charging station, Level 1 and 2 | P | P | P | P |
| Electric vehicle charging station, Level 3 | P | NA | NA | NA |
| Farm stand | P | P | P | P |
| Garage, private[1] | P | P | P | P |
| Garage sale[1] | P | P | P | P |
| Garden houses/tool sheds[1] | P | P | P | P |
| Other customarily accessory uses and/or buildings[1] | P | P | P | P |
| Stables, private [1,5] | P | P | P | P |
| Swimming pools[1] | P | P | P | P |

**NOTES**

[1] Site plan approval not required. Application to the Office of the Code Enforcement Officer may be required in accordance with Chapter 34. See Chapter 34 for requirements.

[2] Refer to Article IV, Supplementary Regulations, for specific requirements, standards and conditions.

[3] Refer to Town of Highland Code Chapter 20, Adult-Oriented Business.

[4] Requires commercial logging permit. Refer to Chapter 115, Logging. Site plan approval not required.

[5] Maximum of two horses per acre.

[6] Six-acre minimum lot area required outside H-C zoning districts.

[7] Less than 2,000 square feet in the Designated River Corridor.

[8] In Designated Delaware River Corridor only; should be considered permitted (P) outside of corridor.

# John D. Fuller, P. E., P.C.

## CIVIL & STRUCTURAL ENGINEERING

February 10, 2023

Mr. Norman Sutherland, Chairman
Town of Highland Planning Board
4 Proctor Rd.
PO Box 397
Eldred, NY 12732
planningboardzba@townofhighlandny.com

**RE:    211 Mail Road**
**Section 15 Block 1 Lots 70.1 & 70.2**
**Town of Highland, Sullivan County, NY**

Dear Mr. Sutherland:

Enclosed is an application, EAF and Sketch Plan for the above referenced property.  The property, known as Catskill Mountains Resort, is currently under contract to be purchased by Yeshiva Ohr Shraga Veretzky, 1102 Ave L, Brooklyn, NY 11230 from the current owner, 211 Mail Rd., LLC, 211 Mail Rd., Barryville, NY 12719.

The property is located in the Residential – Agricultural (R-2) Zoning District.  The existing use is defined as a "Hotel," which is a specially permitted use and for which a Special Use Permit has been issued.  The new owner would like to add four (4) 5,800 sf dormitories, an 800sf Mikva and a 10,150 sf Multi-purpose building to the site and operate as a "religious retreat" during the summer months, which would appear to also require a Special Use Permit.  The new dormitories and multi-purpose building will be serviced by a new drilled well and septic system.

The attached Sketch Plan is being submitted to request a Pre-Submission Conference be held at the next Planning Board meeting for review and clarification of any necessary items or information which the Board may require.

Please see the attached sketch plan for details and contact my office if you have any questions.

Thank you,

John D. Fuller, P.E.

4 South Street, Port Jervis, NY 12771
Tel:  (845) 856-1536          Fax:  (845) 858-2419          Email:  johndfullerpe@gmail.com

7.   Determination and Filing:

7.1   Final SEQRA determination by Lead Agency

7.2   A determination shall be made in the form of a RESOLUTION within sixty-two (62) days of the close of a Public Hearing on a completed Subdivision Application.

7.3   Any conditions of the subdivision approval and any variances shall be set forth and noted on the final subdivision plat.

7.4   Within five (5) business days of the adoption of the RESOLUTION granting approval of such subdivision plat, such plat shall be certified by the Chairman of the Planning Board as having been granted approval and a copy of the plat and RESOLUTION shall be filed in the Planning Board's Office. A copy of the RESOLUTION shall be mailed to the owner.

7.5   The subdivision plat shall be filed in the Sullivan County Clerk's Office within sixty-two (62) days by the Applicant. Failure to comply with this provision will invalidate the subdivision approval.

7.6   Proof of the filing of the subdivision plat shall be furnished to the Chairman of the Planning Board within ten (10) days of filing and upon receipt thereof the process is completed. The closed file shall be kept on record in the office of the Planning Board, Town Hall, Eldred, New York.

## TOWN OF HIGHLAND APPLICATION

☒ FOR SITE PLAN APPROVAL
☒ FOR SPECIAL USE PERMIT

Name of proposed development: Yeshiva Ohr Shraga Veretzky

10                                                                Rev. 8/3/2020

Applicant:

Name Yeshiva Ohr Shraga Veretzky

Address 1102 Ave. L Brooklyn, NY 11230

Telephone 718-252-7777

Owner: (If different from Applicant. If more than one owner, please provide information for each).

Name 211 Mail Road LLC

Address 211 Mail Rd, Barryville, NY 12719

Telephone

Ownership intentions: (i.e. purchase options) The applicant is in contract with the owner to purchase the property.

Location of Site: 211 Mail Rd Barryville, NY 12719

Tax Map description: Section: 15  Block: 1  Lot: 70.1, and 70.2

Current zoning

classification: R-2

Local, County, State and Federal permits needed: (Please list type of permit and appropriate agency or department).

Proposed use(s) of site: Add the use of a religious resort in addition to the existing Hotel use

Total site area: (square feet or acres) 15.-1-70.1 - 33.71 Acres, 15.-1-70.2 - 6.52 Acres

Anticipated construction time: Spring and Summer of 2023

Will development be staged? No

Current land use of site: (agricultural, commercial, residential, undeveloped, etc.)

Hotel

11

Rev. 8/3/2020

Current condition of site: (buildings, brush, etc.) Hotel site with many buildings and
amenities

Estimated cost of proposed improvement(s): $1,500,000.00

Anticipated increase in number of residents, visitors, shoppers, employees, etc.: (if applicable)
    Additional 128 beds are proposed within the 4 proposed dormitories, which may increase
visitors on visiting day in the summer time. There is plenty of parking area to accomodate them.

Describe proposed use(s), including primary and secondary uses: ground floor area,
height, and number of stories for each building:

_____ for residential buildings, include number of dwelling units by size (efficiency,

one bedroom, two or more bedrooms, etc.) and number of parking spaces to be

provided

_____ for non-residential buildings, include total floor area and total sales area, number

of automobile and truck parking spaces

_____ other proposed structures

(Please use separate sheet(s) if needed):
(4) dormitories to be used for sleeping accommodations for 32 students, ±5,800
square feet, and 1 story tall.

A mikva (ritual bath) building. ±800 square feet, and 1 story tall.

Multi-use building to be used for studying, lectures, prayer, etc. ±10,150 square
feet, and 1 story tall.

The undersigned hereby requests approval by the Planning Board.

Signature_____

Title Applicant_____

12                                                    Rev. 8/3/2020

Date  2|13|2023

If the above signature is not that of the property owner, signature of said owner is required.

Signature _____

Title  OWNER _____

Date  2-13-2023 _____

Sworn to before me this

13th day of February , 2023.

_____
Notary Public

Fee Received on _____, 20___ .

CHAYA NEUMANN
Notary Public, State of New York
No. 01NE6124793
Qualified in Kings County
Commission Expires April 4, 20 25

**TOWN OF HIGHLAND APPLICATION
FOR REVIEW AND APPROVAL OF
LOT IMPROVEMENT / SUBDIVISION**

1. Name or Identify Title: _____

13                                                            Rev. 8/3/2020

## *Short Environmental Assessment Form*
### *Part 1 - Project Information*

**Instructions for Completing**

**Part 1 – Project Information. The applicant or project sponsor is responsible for the completion of Part 1.** Responses become part of the application for approval or funding, are subject to public review, and may be subject to further verification. Complete Part 1 based on information currently available. If additional research or investigation would be needed to fully respond to any item, please answer as thoroughly as possible based on current information.

Complete all items in Part 1. You may also provide any additional information which you believe will be needed by or useful to the lead agency; attach additional pages as necessary to supplement any item.

---

**Part 1 – Project and Sponsor Information**

Yeshiva Ohr Shraga Veretzky

Name of Action or Project:

Yeshiva Ohr Shraga Veretzky

Project Location (describe, and attach a location map):

211 Mail Road, Barryville, NY 12719

Brief Description of Proposed Action:

Add the use of a place of worship in addition to the existing hotel use.

To add:
(4) dormitories to be used for sleeping accommodations for 32 students, ±5,800 square feet, and 1 story tall.

A mikva (ritual bath) building, ±800 square feet, and 1 story tall.

Multi-use building to be used for studying, lectures, prayer, etc. ±10,150 square feet, and 1 story tall.

| Name of Applicant or Sponsor: | Telephone: 845-856-1536 |
|---|---|
| John D. Fuller | E-Mail: johndfullerpe@gmail.com |

Address:

4 South Street

| City/PO: | State: | Zip Code: |
|---|---|---|
| Port Jervis | NY | |

| | NO | YES |
|---|---|---|
| 1. Does the proposed action only involve the legislative adoption of a plan, local law, ordinance, administrative rule, or regulation?<br>If Yes, attach a narrative description of the intent of the proposed action and the environmental resources that may be affected in the municipality and proceed to Part 2. If no, continue to question 2. | ☑ | ☐ |
| 2. Does the proposed action require a permit, approval or funding from any other government Agency? | NO | YES |
| If Yes, list agency(s) name and permit or approval: NYSDOH for water / NYSDEC for sewer | ☐ | ☑ |

3.  a. Total acreage of the site of the proposed action?     ±40.23 acres
    b. Total acreage to be physically disturbed?     ±2 acres
    c. Total acreage (project site and any contiguous properties) owned
       or controlled by the applicant or project sponsor?     ±40.23 acres

4.  Check all land uses that occur on, are adjoining or near the proposed action:

5.  ☑ Urban   ☐ Rural (non-agriculture)   ☐ Industrial   ☐ Commercial   ☐ Residential (suburban)

    ☑ Forest   ☐ Agriculture   ☐ Aquatic   ☐ Other(Specify):

    ☐ Parkland

---

| | NO | YES | N/A |
|---|---|---|---|
| 5. Is the proposed action, | | | |
| a. A permitted use under the zoning regulations? | ☐ | ☑ | ☐ |
| b. Consistent with the adopted comprehensive plan? | ☐ | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 6. Is the proposed action consistent with the predominant character of the existing built or natural landscape? | ☐ | ☑ |

| | NO | YES |
|---|---|---|
| 7. Is the site of the proposed action located in, or does it adjoin, a state listed Critical Environmental Area? <br> If Yes, identify: _____ | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 8. a. Will the proposed action result in a substantial increase in traffic above present levels? | ☑ | ☐ |
| b. Are public transportation services available at or near the site of the proposed action? | ☑ | ☐ |
| c. Are any pedestrian accommodations or bicycle routes available on or near the site of the proposed action? | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 9. Does the proposed action meet or exceed the state energy code requirements? <br> If the proposed action will exceed requirements, describe design features and technologies: <br> _____ <br> _____ | ☐ | ☑ |

| | NO | YES |
|---|---|---|
| 10. Will the proposed action connect to an existing public/private water supply? <br>      If No, describe method for providing potable water: _____ <br> An additional well will be drilled, and the water system will be upgraded to handle the increased demand. | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 11. Will the proposed action connect to existing wastewater utilities? <br>      If No, describe method for providing wastewater treatment: _____ <br> A septic system will be installed for the proposed buildings. | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 12. a. Does the project site contain, or is it substantially contiguous to, a building, archaeological site, or district which is listed on the National or State Register of Historic Places, or that has been determined by the Commissioner of the NYS Office of Parks, Recreation and Historic Preservation to be eligible for listing on the State Register of Historic Places? | ☑ | ☐ |
| b. Is the project site, or any portion of it, located in or adjacent to an area designated as sensitive for archaeological sites on the NY State Historic Preservation Office (SHPO) archaeological site inventory? | ☑ | ☐ |

| | NO | YES |
|---|---|---|
| 13. a. Does any portion of the site of the proposed action, or lands adjoining the proposed action, contain wetlands or other waterbodies regulated by a federal, state or local agency? | ☐ | ☑ |
| b. Would the proposed action physically alter, or encroach into, any existing wetland or waterbody? | ☑ | ☐ |
| If Yes, identify the wetland or waterbody and extent of alterations in square feet or acres: _____ | | |

| | | NO | YES |
|---|---|---|---|
| 14. Identify the typical habitat types that occur on, or are likely to be found on the project site. Check all that apply:<br><br>☐ Shoreline  ☑ Forest  ☐ Agricultural/grasslands  ☐ Early mid-successional<br><br>☑ Wetland  ☑ Urban  ☐ Suburban | | | |
| 15. Does the site of the proposed action contain any species of animal, or associated habitats, listed by the State or Federal government as threatened or endangered? | | ☑ | ☐ |
| 16. Is the project site located in the 100-year flood plan? | | ☑ | ☐ |
| 17. Will the proposed action create storm water discharge, either from point or non-point sources?<br>If Yes, | | ☐ | ☑ |
| a.  Will storm water discharges flow to adjacent properties? | | ☑ | ☐ |
| b.  Will storm water discharges be directed to established conveyance systems (runoff and storm drains)?<br>If Yes, briefly describe:<br><br>A SWPPP will be prepared to address stormwater management. | | ☑ | ☐ |
| 18. Does the proposed action include construction or other activities that would result in the impoundment of water or other liquids (e.g., retention pond, waste lagoon, dam)?<br>If Yes, explain the purpose and size of the impoundment: _____ | | ☑ | ☐ |
| 19. Has the site of the proposed action or an adjoining property been the location of an active or closed solid waste management facility?<br>If Yes, describe: _____ | | ☑ | ☐ |
| 20. Has the site of the proposed action or an adjoining property been the subject of remediation (ongoing or completed) for hazardous waste?<br>If Yes, describe: _____ | | ☑ | ☐ |

**I CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE**

Applicant/sponsor/name: John D. Fuller     Date: 02/09/2023

Signature: _____     Title: Project Engineer

PRINT FORM

**EAF Mapper Summary Report**

Thursday, February 9, 2023 4:55 PM



**Disclaimer:** The EAF Mapper is a screening tool intended to assist project sponsors and reviewing agencies in preparing an environmental assessment form (EAF). Not all questions asked in the EAF are answered by the EAF Mapper. Additional information on any EAF question can be obtained by consulting the EAF Workbooks. Although the EAF Mapper provides the most up-to-date digital data available to DEC, you may also need to contact local or other data sources in order to obtain data not provided by the Mapper. Digital data is not a substitute for agency determinations.

| | |
|---|---|
| Part 1 / Question 7 [Critical Environmental Area] | No |
| Part 1 / Question 12a [National or State Register of Historic Places or State Eligible Sites] | No |
| Part 1 / Question 12b [Archeological Sites] | No |
| Part 1 / Question 13a [Wetlands or Other Regulated Waterbodies] | Yes - Digital mapping information on local and federal wetlands and waterbodies is known to be incomplete. Refer to EAF Workbook. |
| Part 1 / Question 15 [Threatened or Endangered Animal] | No |
| Part 1 / Question 16 [100 Year Flood Plain] | No |
| Part 1 / Question 20 [Remediation Site] | No |

Short Environmental Assessment Form - EAF Mapper Summary Report

*1*

Case 7:24-cv-08477-CS   Document 12-3   Filed 03/31/25   Page 1 of 1



Town of Highland Planning Board
Minutes March 22, 2023.

Chairman Norm Sutherland calls the meeting to order at 7:00PM.

Pledge to the Flag

Chairman states the minutes are being recorded.
Secretary takes attendance.

| | |
|---|---|
| Attendance: | Norm Sutherland |
| | JT Vogt |
| | Jeffrey Spitz |
| | Steve Bott |
| | Tim McKenna |
| Board Secretary: | Monica McGill |
| Town Attorney: | Michael Davidoff |
| Code Enforcement: | BJ Gettel |
| | |
| Also in attendance: | Laura Burrell (alternate) |

Motion to approve the February 23, 2022 :
Motion: Jeff Spitz              Second: Tim McKenna
All in favor

Norm Sutherland state that county is offering (2) workshops
1. Walkable Community
2. Comprehensive Plan
Mr. Sutherland also attended the Round Table Work shop held at the Senior Center in Eldred NY and found it quite satisfying.

The Town of Highland Planning Board has been working on improvements to the application process.
The Eldred High School was unavailable for tonight's meeting due to a schedule conflict.
Escrow amounts are determined on previous application costs and projects.

**Application #1-2023 Ronald Walborn Short Term Residential Rental Permit Public Hearing**
Property located on 437 State Route 55 Eldred NY 12732
Motion to open the public hearing on Application #1-2023:
Motion: J.T. Vogt              Second: Jeff Spitz
All in favor
Secretary reads the public notice posted in the local newspapers.
Letter received by James Grundy was read into record.
There were (9) letters mailed to surrounding neighbors and (8) returned
Mr. Walborn has owned the property since 2004 and was used as a second residence. Now that his children are grown, he rents the property out two times a month.
Motion to close the public hearing on Application #1-2023:
Motion: Tim McKenna              Second: Steve Bott
All in favor
SEQR Part (2) read by Michael Davidoff and completed by the board.
Motion for SEQR part 2 will not result in any significant adverse environmental impacts:
Motion: Jeff Spitz              Second: Tim McKenna
All in favor
As per Code Enforcement Fire Inspection has been completed and passed.

owns all the adjacent properties and he is the primary caretaker for removal of the garbage and maintenance. He feels that his property should be grandfathered in. Mr. Robinson worked for the UDC (Upper Delaware Council) on the committee to protection of Private Property. By not having this grandfather clause he feels the town is taking away that right. Mr. Robinson is asking the board to waive his public hearing. He feels this law should be only for new applicants. He states that all the tenants he has ever had have never been a problem.

Mr. Sutherland states that may apply to you but not to all short-term rentals. There is always concerns renting to people who do not know the property or the area.

Motion to schedule a public hearing on application #8-2023 to be held at the Eldred Town Hall on April 26, 2023 at 6PM.
Motion: Tim McKenna          Second: Steve Bott
All in favor

Mr. Robinson will need to schedule a fire inspection with the code office to be completed before the scheduled public hearing.
Please see attached UDC email in regards to this short-term rental application.

### Application #10-2023 Drew Villano Short Term Residential Permit

Ms. Villano owns a home at 186 Eldred Yulan Road in Eldred NY.  She purchased the property two years ago and because her job entails a lot of travel, she rents the property to cover the mortgage. She has a very strict policy that the tenants follow and she does an extensive background check on all that inquire.

Motion to schedule a public hearing on application #10-2023 to be held at the Eldred Town Hall on April 26, 2023 at 6PM.
Motion: Tim McKenna          Second: Jeff Spitz
All in favor

Ms. Villano will need to schedule a fire inspection with the code office to be completed before the scheduled public hearing.

### Application #7-2023 211 Mail Road LLC Special Use Permit

John D. Fuller, P.E.,P.C. Civil and Structural Engineer, and Steven Barshovsive (attorney) are representing the applicant.

The property on 211 Mail Road known as the Catskill Resort has been purchased by Yeshiva Ohr Shraga Veretzky located in Brooklyn. The property is identified as a Hotel/Motel Restaurant. The new owner is presenting the board with a new application for a new special use permit for the following:

- To add (4) 5,800 square foot dormitories
- (1) 800 square foot Mikva
- A 10,150 square foot multi-purpose building

They are looking to run a religious retreat during the summer months

The new dormitories and multi-purpose building will be serviced by a new drilled well and septic system.

Mr. Barshovsive states that some parts of the property are not used, for example the pool that is primarily used in the summer.

Mr. Fuller also represented the previous owner and is very familiar with the property. He states that the two large septic systems have been overhauled in the last year.

The preliminary application was presented to the town's consultant Leberge Group and they have sent their response that was read by Norm Sutherland and will be attached to these minutes.

Therefore at this time the board will give the applicant time to review the report from the consultant and obtain a complete site plan to be presented by April 12, 2023 to be put on the April 26, 2023 agenda.

If the applicant wishes to re-submit the application, they will need to provide an escrow amount of $5000.00 upon such re-submission.

### Application #9-2023 Shane Pearson & Courtney Crangi Special Use Permit Cannabis

Mr. Pearson and Ms. Crangi are looking to open a cannabis micro business.

Norm Sutherland: parts of the application are incomplete for example the description on the SEQR part 1 form.

Ruben Lindo of Grid Iron Ent Mgt. Group explains the description is based on the law and intended operation.

Norm Sutherland inquires that the business is looking to grow and sell?

Shane Pearson: As per state license.

Rubin Lindo: explains to cultivate, grow, process and sell, but not to run a large farm.

Tim McKenna: Where will the business be located?

Shane Pearson: 3465 State Route 97 Barryville NY 12719

Rubin Lindo: This will be indoor grow only, not outdoor.

In order to move forward on the application the board will require a stamped engineer site plan that also shows the distance of the proposed business from churches and schools.

# John D. Fuller, P. E., P.C.

## CIVIL & STRUCTURAL ENGINEERING

February 10, 2023

Mr. Norman Sutherland, Chairman
Town of Highland Planning Board
4 Proctor Rd.
PO Box 397
Eldred, NY 12732
planningboardzba@townofhighlandny.com

RE:     211 Mail Road
         Section 15 Block 1 Lots 70.1 & 70.2
         Town of Highland, Sullivan County, NY

Dear Mr. Sutherland:

Enclosed is an application, EAF and Sketch Plan for the above referenced property. The property, known as Catskill Mountains Resort, is currently under contract to be purchased by Yeshiva Ohr Shraga Veretzky, 1102 Ave L, Brooklyn, NY 11230 from the current owner, 211 Mail Rd., LLC, 211 Mail Rd., Barryville, NY 12719.

The property is located in the Residential – Agricultural (R-2) Zoning District. The existing use is defined as a "Hotel," which is a specially permitted use and for which a Special Use Permit has been issued. The new owner would like to add four (4) 5,800 sf dormitories, an 800sf Mikva and a 10,150 sf Multi-purpose building to the site and operate as a "religious retreat" during the summer months, which would appear to also require a Special Use Permit. The new dormitories and multi-purpose building will be serviced by a new drilled well and septic system.

The attached Sketch Plan is being submitted to request a Pre-Submission Conference be held at the next Planning Board meeting for review and clarification of any necessary items or information which the Board may require.

Please see the attached sketch plan for details and contact my office if you have any questions.

Thank you.

John D. Fuller, P.E.

4 South Street, Port Jervis, NY 12771
Tel: (845) 856-1536          Fax: (845) 858-2419          Email: johndfullerpe@gmail.com

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 4 of 19

 

ENGINEERING · ARCHITECTURE · SURVEYING · PLANNING

## MEMORANDUM

TO: Michael Davidoff, Esq., Drew, Davidoff & Edwards – Attorney to the Town of Highland
Julie Brennan, Legal Assistant, Drew, Davidoff & Edwards

CC: Jeffery Haas – Supervisor, Town of Highland
Nicole Allen, AICP – Planning Services Manager, Laberge Group

FROM: Kevin Schwenzfeier – Senior Planner, Laberge Group

DATE: March 20, 2023

RE: **Proposed Special Use Review of 211 Mail Road Pre-Submission Planning Board**

As requested, please find below a special use review for the Pre-Submission for 211 Mail Road, in the Town of Highland.

| | |
|---|---|
| **Applicant:** | John D. Fuller, P.E. |
| **Address:** | 211 Mail Road |
| **SBL:** | 15.-1-70.1 & 15.-1-70.2 |
| **Zoning:** | Agricultural-Residential (R2) |
| **Request:** | Special Use Permit – Change of Use |

### Application Discussion:

- The applicant seeks a new special use permit for the addition of four (4) 5,800 sf dormitories, an 800 sf Mikvah, and a 10,150 sf multi-purpose building for operation as a religious retreat to a property currently specially permitted as a "Hotel".

- The dormitories and multi-purpose building would be serviced by a new drilled well and septic system.

### Assessment of Request:

According to the Town of Highland Zoning Code §190-12(B) – "Any use not listed specifically within the Chapter 190 Schedule 2: District Schedule of Use Regulations shall be considered a prohibited use in all districts under this chapter." Therefore, the following special use review is offered:

- Religious Retreat is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.

- Dormitory is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.

- Mikvah, while not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations, is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.

- Multi-purpose building while not specifically listed is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.

Memo Town of Highland – Proposed Special Use Review
211 Mail Road Pre-Submission Planning Board
March 20, 2023
Page 2 of 2

---

## Conclusion

Based on a complete review of the Town of Highland Chapter 190 "Zoning" and Chapter 190 Schedule 2: District Schedule of Use Regulations:

1. While elements proposed by the applicant may be specially permitted uses as part of a "Place of Worship," not all elements are considered common uses of a hotel.

2. A "Religious Retreat" is not a permitted or specially permitted use in the Town of Highland.

3. The change in use from a hotel to a dormitory, for religious or non-religious purposes is not permitted in the Town of Highland.

Therefore, for the purpose of this zoning interpretation, a change in use from hotel to retreat, for religious or nonreligious purposes is not permitted.

Case 7:24-cv-08477-CS     Document 12-4     Filed 03/31/25     Page 6 of 19

| | Agency Use Only [If applicable] |
|---|---|
| *Full Environmental Assessment Form* | Project Camp FIMFO Catskills |
| *Part 2 – Identification of Potential Project Impacts* | Date: |

Part 2 is to be completed by the lead agency. Part 2 is designed to help the lead agency inventory all potential resources that could be affected by a proposed project or action. We recognize that the lead agency's reviewer(s) will not necessarily be environmental professionals. So, the questions are designed to walk a reviewer through the assessment process by providing a series of questions that can be answered using the information found in Part 1. To further assist the lead agency in completing Part 2, the form identifies the most relevant questions in Part 1 that will provide the information needed to answer the Part 2 question. When Part 2 is completed, the lead agency will have identified the relevant environmental areas that may be impacted by the proposed activity.

If the lead agency is a state agency and the action is in any Coastal Area, complete the Coastal Assessment Form before proceeding with this assessment.

Tips for completing Part 2:

- Review all of the information provided in Part 1.
- Review any application, maps, supporting materials and the Full EAF Workbook.
- Answer each of the 18 questions in Part 2.
- If you answer "Yes" to a numbered question, please complete all the questions that follow in that section.
- If you answer "No" to a numbered question, move on to the next numbered question.
- Check appropriate column to indicate the anticipated size of the impact.
- Proposed projects that would exceed a numeric threshold contained in a question should result in the reviewing agency checking the box "Moderate to large impact may occur."
- The reviewer is not expected to be an expert in environmental analysis.
- If you are not sure or undecided about the size of an impact, it may help to review the sub-questions for the general question and consult the workbook.
- When answering a question consider all components of the proposed activity, that is, the "whole action".
- Consider the possibility for long-term and cumulative impacts as well as direct impacts.
- Answer the question in a reasonable manner considering the scale and context of the project.

| 1. **Impact on Land**<br>Proposed action may involve construction on, or physical alteration of, the land surface of the proposed site. (See Part 1. D.1)<br>*If "Yes", answer questions a - j. If "No", move on to Section 2.* | ☐NO ☑YES | | |
|---|---|---|---|
| | **Relevant Part I Question(s)** | **No, or small impact may occur** | **Moderate to large impact may occur** |
| a. The proposed action may involve construction on land where depth to water table is less than 3 feet. Soil testing and available soil information indicate most soils have groundwater at depth of > 6 FT on the site. Where shallow groundwater is encountered it will be dewatered according to best engineering practices. | E2d | Small Impact ☑ | ☐ |
| b. The proposed action may involve construction on slopes of 15% or greater. Approximately 2 ac. of impact for road widening of existing road for emergency access. | E2f | Small Impact ☑ | ☐ |
| c. The proposed action may involve construction on land where bedrock is exposed, or generally within 5 feet of existing ground surface. Proposed disturbance to bedrock is primarily for improved/widened roadways for emergency access and improved utilities. | E2a | Small Impact ☑ | ☐ |
| d. The proposed action may involve the excavation and removal of more than 1,000 tons of natural material. Greater than 1,000 tons of natural material may be removed to improve and modernize utilities and roadways. Applicant is seeking to maintain on site to greatest extent. | D2a | Small Impact ☑ | ☐ |
| e. The proposed action may involve construction that continues for more than one year or in multiple phases. | D1e | ☑ No Impact | ☐ |
| f. The proposed action may result in increased erosion, whether from physical disturbance or vegetation removal (including from treatment by herbicides). Implementation of the SWPPP will ensure no significant adverse impacts | D2e, D2q | Small Impact ☑ | ☐ |
| g. The proposed action is, or may be, located within a Coastal Erosion hazard area. | B1i | No Impact ☑ | ☐ |
| h. Other impacts: None | | ☑ | ☐ |

Page 1 of 10

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 7 of 19

**2. Impact on Geological Features**

The proposed action may result in the modification or destruction of, or inhibit access to, any unique or unusual land forms on the site (e.g., cliffs, dunes, minerals, fossils, caves). (See Part 1. E.2.g)    ☑NO    ☐YES

*If "Yes", answer questions a - c. If "No", move on to Section 3.*

| | Relevant Part 1 Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Identify the specific land form(s) attached: _____ | E2g | ☐ | ☐ |
| b. The proposed action may affect or is adjacent to a geological feature listed as a registered National Natural Landmark.<br>Specific feature: _____ | E3c | ☐ | ☐ |
| c. Other impacts: _____ | | ☐ | ☐ |

**3. Impacts on Surface Water**

The proposed action may affect one or more wetlands or other surface water bodies (e.g., streams, rivers, ponds or lakes). (See Part 1. D.2, E.2.h)    ☐NO    ☑YES

*If "Yes", answer questions a - l. If "No", move on to Section 4.*

| | Relevant Part 1 Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may create a new water body. | D2b, D1h | ☑ No impact | ☐ |
| b. The proposed action may result in an increase or decrease of over 10% or more than a 10 acre increase or decrease in the surface area of any body of water. | D2b | ☑ No impact | ☐ |
| c. The proposed action may involve dredging more than 100 cubic yards of material from a wetland or water body. | D2a | ☑ No impact | ☐ |
| d. The proposed action may involve construction within or adjoining a freshwater or tidal wetland, or in the bed or banks of any other water body. | E2h | ☑ No impact | ☐ |
| e. The proposed action may create turbidity in a waterbody, either from upland erosion, runoff or by disturbing bottom sediments. Implementation of the SWPPP will ensure no significant adverse impacts. | D2a, D2h | ☑ Small impact | ☐ |
| f. The proposed action may include construction of one or more intake(s) for withdrawal of water from surface water. | D2c | ☑ No impact | ☐ |
| g. The proposed action may include construction of one or more outfall(s) for discharge of wastewater to surface water(s). | D2d | ☑ No impact | ☐ |
| h. The proposed action may cause soil erosion, or otherwise create a source of stormwater discharge that may lead to siltation or other degradation of receiving water bodies. Implementation of the SWPPP will ensure no significant adverse impacts. | D2e | ☑ Small impact | ☐ |
| i. The proposed action may affect the water quality of any water bodies within or downstream of the site of the proposed action. Implementation of the SWPPP will ensure no significant adverse impacts | E2h | ☑ Small impact | ☐ |
| j. The proposed action may involve the application of pesticides or herbicides in or around any water body. Typical treatments by licensed professionals. | D2q, E2h | ☑ Small impact | ☐ |
| k. The proposed action may require the construction of new, or expansion of existing, wastewater treatment facilities. | D1a, D2d | ☑ No impact | ☐ |

Page 2 of 10

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 8 of 19

| | | ☑ | ☐ |
|---|---|---|---|
| I. Other impacts: None | | | |

| 4. **Impact on groundwater** <br> The proposed action may result in new or additional use of ground water, or may have the potential to introduce contaminants to ground water or an aquifer. <br> (See Part 1. D.2.a, D.2.c, D.2.d, D.2.p, D.2.q, D.2.t) <br> If "Yes", answer questions a – h. If "No", move on to Section 5. | ☐ NO ☑ YES | | |
|---|---|---|---|
| | **Relevant Part I Question(s)** | **No, or small impact may occur** | **Moderate to large impact may occur** |
| a. The proposed action may require new water supply wells, or create additional demand on supplies from existing water supply wells. No new water supply wells. Additional demand from existing water supply wells only. Well Interference Analysis Report by Miller Hydrogeologic Inc. 12/8/22 determined little impact. | D2c | ☑ Small Impact | ☐ |
| b. Water supply demand from the proposed action may exceed safe and sustainable withdrawal capacity rate of the local supply or aquifer. <br> Cite Source: "Little impact on surround groundwater levels" Miller Hydrogeologic Inc. 12/8/2022 | D2c | ☑ No impact | ☐ |
| c. The proposed action may allow or result in residential uses in areas without water and sewer services. | D1a, D2c | ☑ No impact | ☐ |
| d. The proposed action may include or require wastewater discharged to groundwater. Ellen septic systems use sand filter and are located according to regulated buffers from water supply wells. | D2d, E2l | ☑ Small Impact | ☐ |
| e. The proposed action may result in the construction of water supply wells in locations where groundwater is, or is suspected to be, contaminated. | D2c, E1f, E1g, E1h | ☑ No impact | ☐ |
| f. The proposed action may require the bulk storage of petroleum or chemical products over ground water or an aquifer. All bulk storage tanks contain secondary containment. Other bulk is contained in sealed buckets/containers. | D2p, E2l | ☑ Small Impact | ☐ |
| g. The proposed action may involve the commercial application of pesticides within 100 feet of potable drinking water or irrigation sources. | E2h, D2q, E2l, D2c | ☑ No impact | ☐ |
| h. Other impacts: None | | ☑ | ☐ |

| 5. **Impact on Flooding** <br> The proposed action may result in development on lands subject to flooding. <br> (See Part 1. E.2) <br> If "Yes", answer questions a – g. If "No", move on to Section 6. | ☐ NO ☑ YES | | |
|---|---|---|---|
| | **Relevant Part I Question(s)** | **No, or small impact may occur** | **Moderate to large impact may occur** |
| a. The proposed action may result in development in a designated floodway. | E2i | ☑ No Impact | ☐ |
| b. The proposed action may result in development within a 100 year floodplain. De minimis impact of 298 cubic yards of fill. A floodplain development permit will be sought from the Town. | E2j | ☑ Small Impact | ☐ |
| c. The proposed action may result in development within a 500 year floodplain. Utility connections will be sealed, well caps will be watertight, and backflow valves will be installed. A floodplain development permit will be sought from the Town. | E2k | ☑ Small Impact | ☐ |
| d. The proposed action may result in, or require, modification of existing drainage patterns. Currently there is no stormwater management on site. Stormwater conditions will be improved with the proposed plan. Implementation of the SWPPP will ensure no significant adverse impacts. | D2b, D2e | ☑ Small Impact | ☐ |
| e. The proposed action may change flood water flows that contribute to flooding. Currently there is no stormwater management on site. Stormwater conditions will be improved with the proposed plan. Implementation of the SWPPP will ensure no significant adverse impacts. | D2b, E2i, E2j, E2k | ☑ Small impact | ☐ |
| f. If there is a dam located on the site of the proposed action, is the dam in need of repair. or upgrade? | E1e | ☑ No impact | ☐ |

Page 3 of 10

| g. Other impacts: None | | ☐ | ☑ |
|---|---|---|---|

**6. Impacts on Air**

The proposed action may include a state regulated air emission source.　☑NO　☐YES
(See Part 1. D.2.f., D.2.h. D.2.g)
*If "Yes", answer questions a - f. If "No", move on to Section 7.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. If the proposed action requires federal or state air emission permits, the action may also emit one or more greenhouse gases at or above the following levels: | | | |
|   i. More than 1000 tons/year of carbon dioxide ($CO_2$) | D2g | ☐ | ☐ |
|   ii. More than 3.5 tons/year of nitrous oxide ($N_2O$) | D2g | ☐ | ☐ |
|   iii. More than 1000 tons/year of carbon equivalent of perfluorocarbons (PFCs) | D2g | ☐ | ☐ |
|   iv. More than .045 tons/year of sulfur hexafluoride ($SF_6$) | D2g | ☐ | ☐ |
|   v. More than 1000 tons/year of carbon dioxide equivalent of hydrochloroflourocarbons (HFCs) emissions | D2g | ☐ | ☐ |
|   vi. 43 tons/year or more of methane | D2h | ☐ | ☐ |
| b. The proposed action may generate 10 tons/year or more of any one designated hazardous air pollutant, or 25 tons/year or more of any combination of such hazardous air pollutants. | D2g | ☐ | ☐ |
| c. The proposed action may require a state air registration, or may produce an emissions rate of total contaminants that may exceed 5 lbs. per hour, or may include a heat source capable of producing more than 10 million BTU's per hour. | D2f, D2g | ☐ | ☐ |
| d. The proposed action may reach 50% of any of the thresholds in "a" through "c", above. | D2g | ☐ | ☐ |
| e. The proposed action may result in the combustion or thermal treatment of more than 1 ton of refuse per hour. | D2s | ☐ | ☐ |
| f. Other impacts: _____ | | ☐ | ☐ |

**7. Impact on Plants and Animals**

The proposed action may result in a loss of flora or fauna. (See Part 1. E.2. m.-q.)　☐NO　☑YES
*If "Yes", answer questions a - j. If "No", move on to Section 8.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may cause reduction in population or loss of individuals of any threatened or endangered species, as listed by New York State or the Federal government, that use the site, or are found on, over, or near the site. | E2o | ☑ Small impact | ☐ |
| b. The proposed action may result in a reduction or degradation of any habitat used by any rare, threatened or endangered species, as listed by New York State or the federal government. | E2o | ☑ Small impact | ☐ |
| c. The proposed action may cause reduction in population, or loss of individuals, of any species of special concern or conservation need, as listed by New York State or the Federal government, that use the site, or are found on, over, or near the site. | E2p | ☑ No impact | ☐ |
| d. The proposed action may result in a reduction or degradation of any habitat used by any species of special concern and conservation need, as listed by New York State or the Federal government. | E2p | ☑ No impact | ☐ |

Page 4 of 10

Dwarf wedgemussel habitat is found in Delaware River. The project involves no work in the river; therefore, there will be no impact to this species. Project will retain/ improve water quality runoff through stormwater improvements. The Applicant is consulting with the NYSDEC on potential impacts to overwintering and nesting Bald

Case 7:24-cv-08477-CS     Document 12-4     Filed 03/31/25     Page 10 of 19

| | | | |
|---|---|---|---|
| e. The proposed action may diminish the capacity of a registered National Natural Landmark to support the biological community it was established to protect. | E3c | ☑ No impact | ☐ |
| f. The proposed action may result in the removal of, or ground disturbance in, any portion of a designated significant natural community. Source: No impacts to floodplain forest per Site Plan. | E2n | ☑ No impact | ☐ |
| g. The proposed action may substantially interfere with nesting/breeding, foraging, or over-wintering habitat for the predominant species that occupy or use the project site. Tree clearing during the winter will occur one time. | E2m | ☑ Small impact | ☐ |
| h. The proposed action requires the conversion of more than 10 acres of forest, grassland or any other regionally or locally important habitat. Habitat type & information source: _____ Northern Long-eared Bat habitat. Clearing is allowed under 4(d) rule, USFWS Consistency Letter received 6/7/2022. | E1b | ☑ Small impact | ☐ |
| i. Proposed action (commercial, industrial or recreational projects, only) involves use of herbicides or pesticides. Typical treatments at buildings by licensed contractors. | D2q | ☑ Small impact | ☐ |
| j. Other impacts: None _____ | | ☑ | ☐ |

| 8. Impact on Agricultural Resources<br>The proposed action may impact agricultural resources. (See Part 1. E.3.a. and b.)<br>*If "Yes", answer questions a - h. If "No", move on to Section 9.* | | ☑NO | ☐YES |
|---|---|---|---|
| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
| a. The proposed action may impact soil classified within soil group 1 through 4 of the NYS Land Classification System. | E2c, E3b | ☐ | ☐ |
| b. The proposed action may sever, cross or otherwise limit access to agricultural land (includes cropland, hayfields, pasture, vineyard, orchard, etc). | E1a, E1b | ☐ | ☐ |
| c. The proposed action may result in the excavation or compaction of the soil profile of active agricultural land. | E3b | ☐ | ☐ |
| d. The proposed action may irreversibly convert agricultural land to non-agricultural uses, either more than 2.5 acres if located in an Agricultural District, or more than 10 acres if not within an Agricultural District. | E1b, E3a | ☐ | ☐ |
| e. The proposed action may disrupt or prevent installation of an agricultural land management system. | E1a, E1b | ☐ | ☐ |
| f. The proposed action may result, directly or indirectly, in increased development potential or pressure on farmland. | C2c, C3, D2c, D2d | ☐ | ☐ |
| g. The proposed project is not consistent with the adopted municipal Farmland Protection Plan. | C2c | ☐ | ☐ |
| h. Other impacts: _____ | | ☐ | ☐ |

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 11 of 19

**9. Impact on Aesthetic Resources**
The land use of the proposed action are obviously different from, or are in sharp contrast to, current land use patterns between the proposed project and a scenic or aesthetic resource. (Part 1. E.1.a, E.1.b, E.3.h.)
*If "Yes", answer questions a - g. If "No", go to Section 10.*

☐ NO    ☑ YES

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Proposed action may be visible from any officially designated federal, state, or local scenic or aesthetic resource. The modernization and improvement project will not dramatically change the appearance of this existing campground. Suitable landscaping and neutral color scheme will ensure impacts are minimal. | E3h | ☑ Small impact | ☐ |
| b. The proposed action may result in the obstruction, elimination or significant screening of one or more officially designated scenic views. | E3h, C2b | ☑ No impact | ☐ |
| c. The proposed action may be visible from publicly accessible vantage points: | E3h | Small impact | |
| i. Seasonally (e.g., screened by summer foliage, but visible during other seasons) | | ☑ | ☐ |
| ii. Year round  The modernization and improvement project will not dramatically change the appearance of this existing campground. Suitable landscaping and neutral color scheme will ensure impacts are minimal. | | ☑ | ☐ |
| d. The situation or activity in which viewers are engaged while viewing the proposed action is: The modernization and improvement project will not dramatically change the appearance of this existing campground. Suitable landscaping and neutral color scheme will ensure impacts are minimal. | E3h E2q, | Small impact | |
| i. Routine travel by residents, including travel to and from work | E1c | ☑ | ☐ |
| ii. Recreational or tourism based activities | | ☑ | ☐ |
| e. The proposed action may cause a diminishment of the public enjoyment and appreciation of the designated aesthetic resource. | E3h | ☑ No impact | ☐ |
| f. There are similar projects visible within the following distance of the proposed project:  0-1/2 mile  ½-3 mile  3-5 mile  5+ mile | D1a, E1a, D1f, D1g | ☑ No impact | ☐ |
| g. Other impacts: None | | ☑ | ☐ |

**10. Impact on Historic and Archeological Resources**
The proposed action may occur in or adjacent to a historic or archaeological resource. (Part 1. E.3.e, f. and g.)
*If "Yes", answer questions a - e. If "No", go to Section 11.*

☐ NO    ☑ YES

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may occur wholly or partially within, or substantially contiguous to, any buildings, archaeological site or district which is listed on the National or State Register of Historical Places, or that has been determined by the Commissioner of the NYS Office of Parks, Recreation and Historic Preservation to be eligible for listing on the State Register of Historic Places. | E3e | ☑ No impact | ☐ |
| b. The proposed action may occur wholly or partially within, or substantially contiguous to, an area designated as sensitive for archaeological sites on the NY State Historic Preservation Office (SHPO) archaeological site inventory. 4/29/2022 SHPO No Impact Letter | E3f | ☑ No impact | ☐ |
| c. The proposed action may occur wholly or partially within, or substantially contiguous to, an archaeological site not included on the NY SHPO inventory.  Source: | E3g | ☑ No impact | ☐ |

Page 6 of 10

Case 7:24-cv-08477-CS     Document 12-4     Filed 03/31/25     Page 12 of 19

| | | | |
|---|---|---|---|
| d. Other impacts: None | | ☑ | ☐ |

| | | Not Applicable | | |
|---|---|---|---|---|
| e. If any of the above (a-d) are answered "Moderate to large impact may occur", continue with the following questions to help support conclusions in Part 3: | | Not Applicable | | |
| i. The proposed action may result in the destruction or alteration of all or part of the site or property. | E3e, E3g, E3f | | ☐ | ☐ |
| ii. The proposed action may result in the alteration of the property's setting or integrity. | E3e, E3f, E3g, E1a, E1b | | ☐ | ☐ |
| iii. The proposed action may result in the introduction of visual elements which are out of character with the site or property, or may alter its setting. | E3e, E3f, E3g, E3h, C2, C3 | | ☐ | ☐ |

**11. Impact on Open Space and Recreation**
The proposed action may result in a loss of recreational opportunities or a reduction of an open space resource as designated in any adopted municipal open space plan.
(See Part 1. C.2.c, E.1.c., E.2.q.)
*If "Yes", answer questions a - e. If "No", go to Section 12.*     ☑ NO    ☐ YES

| The modernization and improvement project will improve the wastewater, water, stormwater, and emergency access at the existing campground while improving the aesthetics and modernizing the operations and experience consistent with the goals of the Comprehensive Plan. | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may result in an impairment of natural functions, or "ecosystem services", provided by an undeveloped area, including but not limited to stormwater storage, nutrient cycling, wildlife habitat. | D2e, E1b E2h, E2m, E2o, E2n, E2p | ☐ | ☐ |
| b. The proposed action may result in the loss of a current or future recreational resource. | C2a, E1c, C2c. E2q | ☐ | ☐ |
| c. The proposed action may eliminate open space or recreational resource in an area with few such resources. | C2a. C2c E1c, E2q | ☐ | ☐ |
| d. The proposed action may result in loss of an area now used informally by the community as an open space resource. | C2c, E1c | ☐ | ☐ |
| e. Other impacts: | | ☐ | ☐ |

**12. Impact on Critical Environmental Areas**
The proposed action may be located within or adjacent to a critical environmental area (CEA). (See Part 1. E.3.d)
*If "Yes", answer questions a - c. If "No", go to Section 13.*     ☑ NO    ☐ YES

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may result in a reduction in the quantity of the resource or characteristic which was the basis for designation of the CEA. | E3d | ☐ | ☐ |
| b. The proposed action may result in a reduction in the quality of the resource or characteristic which was the basis for designation of the CEA. | E3d | ☐ | ☐ |
| c. Other impacts: | | ☐ | ☐ |

Page 7 of 10

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 13 of 19

### 13. Impact on Transportation

The proposed action may result in a change to existing transportation systems. ☐ NO   ☑ YES
(See Part 1. D.2.j)

*If "Yes", answer questions a - f. If "No", go to Section 14.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. Projected traffic increase may exceed capacity of existing road network. | D2j | ☑ No Impact | ☐ |
| b. The proposed action may result in the construction of paved parking area for 500 or more vehicles. | D2j | ☑ No impact | ☐ |
| c. The proposed action will degrade existing transit access. | D2j | ☑ No impact | ☐ |
| d. The proposed action will degrade existing pedestrian or bicycle accommodations. No new campgrounds are proposed. Rear access will be constructed and river trail parking will occur on the river side of NYS 97 | D2j | ☑ No Impact | ☐ |
| e. The proposed action may alter the present pattern of movement of people or goods. The aquatic center is accessible to campers only and there are no proposed changes to river operations. | D2j | ☑ Small impact | ☐ |
| f. Other impacts: None | | ☑ | ☐ |

### 14. Impact on Energy

The proposed action may cause an increase in the use of any form of energy. ☐ NO   ☑ YES
(See Part 1. D.2.k)

*If "Yes", answer questions a - e. If "No", go to Section 15.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action will require a new, or an upgrade to an existing, substation. | D2k | ☑ No impact | ☐ |
| b. The proposed action will require the creation or extension of an energy transmission or supply system to serve more than 50 single or two-family residences or to serve a commercial or industrial use. | D1f, D1q, D2k | ☑ No impact | ☐ |
| c. The proposed action may utilize more than 2,500 MWhrs per year of electricity. The site is occupied by an existing campground which currently utilizes energy. With the proposed action the total projected annual energy is estimated to be 1,625 MWhrs. | D2k | ☑ No impact | ☐ |
| d. The proposed action may involve heating and/or cooling of more than 100,000 square feet of building area when completed. The site's use is seasonal. RVs are not buildings, but assuming they are for this purpose, the total SF is approximately 95,000 SF | D1g | ☑ No impact | ☐ |
| e. Other Impacts: None | | ☑ | ☐ |

### 15. Impact on Noise, Odor, and Light

The proposed action may result in an increase in noise, odors, or outdoor lighting. ☐ NO   ☑ YES
(See Part 1. D.2.m., n., and o.)

*If "Yes", answer questions a - f. If "No", go to Section 16.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action may produce sound above noise levels established by local regulation. The noise analysis demonstrated that noise levels with not exceed local regulations. Per NYSDEC, no appreciable effect will occur with the increase of 0.1 dBA. | D2m | ☑ No impact | ☐ |
| b. The proposed action may result in blasting within 1,500 feet of any residence, hospital, school, licensed day care center, or nursing home. No blasting will occur. Rock removal by trenching, ripping, and hydraulic hammering. | D2m, E1d | ☑ No impact | ☐ |
| c. The proposed action may result in routine odors for more than one hour per day. Campground fires with typical smells will continue as in the existing condition. | D2o | ☑ Small impact | ☐ |

*Page 8 of 10*

| | | No impact | |
|---|---|---|---|
| d. The proposed action may result in light shining onto adjoining properties. As demonstrated in the photometric plan, no light will shine onto adjoining properties. | D2n | ☑ | ☐ |
| e. The proposed action may result in lighting creating sky-glow brighter than existing area conditions. Lights are dark sky compliant and downward directed. Lighting is being added in a few locations for safety reasons and there is not a substantive change from existing conditions. | D2n, E1a | ☑ No impact | ☐ |
| f. Other impacts: None | | ☑ | ☐ |

**16. Impact on Human Health**

The proposed action may have an impact on human health from exposure to new or existing sources of contaminants. (See Part 1.D.2.q., E.1. d. f. g. and h.)    ☐ NO   ☑ YES

*If "Yes", answer questions a - m.  If "No", go to Section 17.*

| | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
|---|---|---|---|
| a. The proposed action is located within 1500 feet of a school, hospital, licensed day care center, group home, nursing home or retirement community. | E1d | ☑ No impact | ☐ |
| b. The site of the proposed action is currently undergoing remediation. | E1g, E1h | ☑ No impact | ☐ |
| c. There is a completed emergency spill remediation, or a completed environmental site remediation on, or adjacent to, the site of the proposed action. | E1g, E1h | ☑ No impact | ☐ |
| d. The site of the action is subject to an institutional control limiting the use of the property (e.g., easement or deed restriction). | E1g, E1h | ☑ No impact | ☐ |
| e. The proposed action may affect institutional control measures that were put in place to ensure that the site remains protective of the environment and human health. | E1g, E1h | ☑ No impact | ☐ |
| f. The proposed action has adequate control measures in place to ensure that future generation, treatment and/or disposal of hazardous wastes will be protective of the environment and human health. Pre-demolition surveys of buildings have been conducted. Asbestos and lead paint will be handled and disposed of according to applicable regulations. | D2t | ☑ Small impact | ☐ |
| g. The proposed action involves construction or modification of a solid waste management facility. | D2q, E1f | ☑ No impact | ☐ |
| h. The proposed action may result in the unearthing of solid or hazardous waste. | D2q, E1f | ☑ No impact | ☐ |
| i. The proposed action may result in an increase in the rate of disposal, or processing, of solid waste. Similar to existing conditions, dumpsters will be managed by Waste Management. A new trash compactor will be implemented. | D2r, D2s | ☑ Small impact | ☐ |
| j. The proposed action may result in excavation or other disturbance within 2000 feet of a site used for the disposal of solid or hazardous waste. | E1f, E1g E1h | ☑ Small impact | ☐ |
| k. The proposed action may result in the migration of explosive gases from a landfill site to adjacent off site structures. | E1f, E1g | ☑ No impact | ☐ |
| l. The proposed action may result in the release of contaminated leachate from the project site. | D2s, E1f, D2r | ☑ No impact | ☐ |
| m. Other impacts: None | | ☑ | ☐ |

Barnes Landfill, a former private municipal landfill, is located within 2,000 FT of the project site. The primary concern is groundwater, which is monitored by NYSDEC and has shown no exceedances at receptor locations. The project does not require the installation of new water supply wells and existing water supply wells will continue to be regulated by the NYSDOH with regular testing required. In addition, the existing wells will be required to undergo additional treatment as part of the project. Ground disturbance will occur within 2,000 FT, involving road widening, utility trenching, installation of stormwater practices, construction of aquatic center, construction of buildings, including foundations and footings, and construction of retaining walls.

Page 9 of 10

Case 7:24-cv-08477-CS    Document 12-4    Filed 03/31/25    Page 15 of 19

| 17. Consistency with Community Plans<br>The proposed action is not consistent with adopted land use plans.<br>(See Part 1. C.1, C.2. and C.3.)<br>*If "Yes", answer questions a - h.  If "No", go to Section 18.* | ☑NO ☐YES | | |
|---|---|---|---|
| The project to improve and modernize an existing recreational and tourism asset of the Town and County is consistent with community plans. | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
| a. The proposed action's land use components may be different from, or in sharp contrast to, current surrounding land use pattern(s). | C2, C3, D1a E1a, E1b | ☐ | ☐ |
| b. The proposed action will cause the permanent population of the city, town or village in which the project is located to grow by more than 5%. | C2 | ☐ | ☐ |
| c. The proposed action is inconsistent with local land use plans or zoning regulations. | C2, C2, C3 | ☐ | ☐ |
| d. The proposed action is inconsistent with any County plans, or other regional land use plans. | C2, C2 | ☐ | ☐ |
| e. The proposed action may cause a change in the density of development that is not supported by existing infrastructure or is distant from existing infrastructure. | C3, D1c, D1d, D1f, D1d, E1b | ☐ | ☐ |
| f. The proposed action is located in an area characterized by low density development that will require new or expanded public infrastructure. | C4, D2c, D2d D2j | ☐ | ☐ |
| g. The proposed action may induce secondary development impacts (e.g., residential or commercial development not included in the proposed action) | C2a | ☐ | ☐ |
| h. Other: _____ | | ☐ | ☐ |

| 18. Consistency with Community Character<br>The proposed project is inconsistent with the existing community character.<br>(See Part 1. C.2, C.3, D.2, E.3)<br>*If "Yes", answer questions a - g.  If "No", proceed to Part 3.* | ☑NO ☐YES | | |
|---|---|---|---|
| The project to improve and modernize an existing recreational and tourism asset of the Town and County is consistent with community plans. Accordingly, it complies with local zoning and is consistent with the historic character of this site and its surroundings. | Relevant Part I Question(s) | No, or small impact may occur | Moderate to large impact may occur |
| a. The proposed action may replace or eliminate existing facilities, structures, or areas of historic importance to the community. | E3e, E3f, E3g | ☐ | ☐ |
| b. The proposed action may create a demand for additional community services (e.g. schools, police and fire) | C4 | ☐ | ☐ |
| c. The proposed action may displace affordable or low-income housing in an area where there is a shortage of such housing. | C2, C3, D1f D1g, E1a | ☐ | ☐ |
| d. The proposed action may interfere with the use or enjoyment of officially recognized or designated public resources. | C2, E3 | ☐ | ☐ |
| e. The proposed action is inconsistent with the predominant architectural scale and character. | C2, C3 | ☐ | ☐ |
| f. Proposed action is inconsistent with the character of the existing natural landscape. | C2, C3 E1a, E1b E2g, E2h | ☐ | ☐ |
| g. Other impacts: _____ | | ☐ | ☐ |

PRINT FULL FORM                    Page 10 of 10

Full Environmental Assessment Form
Part 2 – Identification of Potential Project Impacts
Town of Highland Planning Board Response

1.  **Impact on Land**
    a.  No comment from the board
    b.  No comment from the board
    c.  No comment from the board
    d.  How small of an impact ( report from Keystone Assoc. shows the quantity)
    e.  What are the phases? The project is considered one phase and the construction has several phases.
    f.  No comment from the board
    g.  No comment from the board
    h.  No comment from the board
2.  **Impact on Geological Features – No comment from the board**
3.  **Impacts on surface water**
    a.  No comment from the board
    b.  No comment from the board
    c.  No comment from the board
    d.  No comment from the board
    e.  No comment from the board
    f.  No comment from the board
    g.  No comment from the board (would like to add that all septic systems are Elgin Berry systems)
    h.  No comment from the board
    i.  No comment from the board
    j.  What kind of Pesticides will be used?  Pest Control.
    k.  No comment from the board
    l.  No comment from the board
4.  **Impact on groundwater**
    a.  Jeff Spitz states that the initial impact analysis/study was performed in December 2022 and feels that does not reflect an accurate study. Need to know what the result will be during the busy summer months.  Reply: The wells were run at full capacity in the December 2022 study to show data of what it would be during the summertime.
        Jeff Spitz: With the 279 proposed RV's another study should be done.
        Dan Rubin: The testing was specifically designed to show the highest capacity of water uses and included the affect on the surrounding properties.
        Caren LaBrutto: The Town's engineer Keystone Associates also approved the study.
    b.  No comment from the board
    c.  No comment from the board
    d.  No comment from the board
    e.  No comment from the board
    f.  Where are sealed containers stored?  They are stored in the aquatic area.
    g.  No comment from the board
    h.  No comment from the board
5.  **Impact on Flooding**
    a.  No comment from the board
    b.  No comment from the board
    c.  No comment from the board
    d.  No comment from the board
    e.  No comment from the board
    f.  No comment from the board (for the record the addition of a pedestrian bridge was approved by Keystone Assoc.
    g.  No comment from the board
6.  **Impact on Air**
    a.  No comment from the board

    **b.** No comment from the board
    **c.** No comment from the board
    **d.** No comment from the board
    **e.** No comment from the board
    **f.** No comment from the board

**7. Impact on Plants and Animals**
    **a.** No comment from the board (a study was also done by the UDC (Upper Delaware Council) & NPC (National Park Service)
    **b.** No comment from the board
    **c.** Jeff Spitz: 14.6 acres of forest are to be removed and that does not represent a small impact.
    Caren LaBrutto: Species are defined by the treatment of bark and other characteristics. There are tree clearing restrictions that come from state and federal agencies that we must abide by. We will be clearing trees only during the hibernation period. We have coordinated with Susan Booth of the DEC (Department of Environmental Conservation) Region (3) New Paltz.
    **d.** No comment from the board
    **e.** No comment from the board
    **f.** No comment from the board
    **g.** No comment from the board
    **h.** No comment from the board
    **i.** No comment from the board
    **j.** No comment from the board

**8. Impact on Agricultural Resources**
    **a.** No comment from the board
    **b.** No comment from the board
    **c.** No comment from the board
    **d.** No comment from the board
    **e.** No comment from the board
    **f.** No comment from the board
    **g.** No comment from the board
    **h.** No comment from the board

**9. Impact on Aesthetic Resource**
    **a.** The Park Service was to supply a 3D model from the river side and the road side.
    Dan Rubin: We were unable to obtain a 3D model from the river side and will prepare another view to submit.
    **b.** No comment from the board
    **c.** Jeff Spitz: The 170-thousand-gallon pool that will be visible from Route 97, and I feel that will change the character of the natural aesthetics of the property.
    **d.** The board agree that ( c ) & ( d ) will cause a moderate impact
    **e.** No comment from the board
    **f.** No comment from the board with this addition: ( there are at least (2) liveries not that far from the campground.
    **g.** No comment from the board

**10. Impact on Historic and Archeological Resources**
    **a.** No comment from the board
    **b.** No comment from the board
    **c.** No comment from the board
    **d.** No comment from the board
    **e.** No comment from the board

**11. Impact on Open Space and Recreation**
    **a.** No comment from the board
    **b.** No comment from the board
    **c.** No comment from the board
    **d.** No comment from the board
    **e.** No comment from the board

**12. Impact on Critical Environmental Areas**

    a. No comment from the board
    b. No comment from the board
    c. No comment from the board

**13. Impact on Transportation**
    a. The board is disappointed in the lack of effort by the DOT (Department of Transportation) put into this study. The impact should be moderate as opposed to no impact.
    b. Caren LaBrutto: The total of 286 parking places is less than the previous number submitted.
    c. No comment from the board
    d. No comment from the board
    e. No comment from the board with the addition of that in the past the DOT had a bike lane paved along Route 97 almost to the blinker light in Barryville and then the project was dropped.
    f. No comment from the board

**14. Impact on Energy**
    a. No comment from the board
    b. No comment from the board with the addition of: The electric was upgraded by NYSEG to the Roebling Bridge.
    c. No comment from the board
    d. No comment from the board
    e. No comment from the board

**15. Impact on Noise, Odor, and Light**
    a. Jeff Spitz: The original study was done November 2022 and another study should be done in the peak /summer season.
    Dan Rubin: The study modeled future noise levels, and adds that the study included the Mountain Coaster. The Mountain Coaster is no longer in the plan, therefore reducing the noise study.
    b. No comment from the board
    c. No comment from the board
    d. No comment from the board
    e. No comment from the board
    f. No comment from the board

**16. Impact on Human Health**
    a. No comment from the board
    b. No comment from the board
    c. No comment from the board
    d. No comment from the board
    e. No comment from the board
    f. No comment from the board
    g. No comment from the board
    h. No comment from the board
    i. No comment from the board
    j. No comment from the board
    k. No comment from the board
    l. No comment from the board
    m. No comment from the board

**17. Consistency with Community Plans**
    a. No comment from the board
    b. No comment from the board
    c. No comment from the board
    d. No comment from the board
    e. No comment from the board
    f. The board feels it will cause a traffic impact.
    g. No comment from the board
    h. No comment from the board

**18. Consistency with Community Character**
    a. No comment from the board

**b.** This will put a strain on the town's resources

**c.** No comment from the board

**d.** No comment from the board

**e.** No comment from the board

**f.** No comment from the board

**g.** No comment from the board

TOWN OF HIGHLAND PLANNING BOARD

-----------------------------------------------------------------x

In the Matter of the Application of

CATSKILLS MOUNTAINS RESORT,                    **MEMORANDUM OF LAW**

Applicant.

-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted to confirm, both as a matter of fact and law, that the summer religious educational retreat proposed by the Catskills Mountains Resort ("CMR") on behalf of Yeshiva Ohr Shraga Veretzky (the "Yeshiva") is a religious use as defined in an unbroken line of decisions of the New York courts that has existed for more than fifty years. The applicable law is so clear and beyond any reasonable doubt that no interpretation is needed by the Town of Highland Planning Board (the "Planning Board") from the Town Zoning Board of Appeals. Indeed, not only is New York decisional law crystal clear, but the case law developed pursuant to the federal Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) is in accord with New York law and confirms that the proposed religious educational use is a religious use under RLUIPA and federal law. Finally, as discussed in greater detail *infra*, the United States Department of Justice (DOJ) has issued an official "Statement" in which the elements of religious use are delineated and discussed. The proposed religious educational retreat meets all of DOJ's criteria for religious use.

CMR proposes to allow the Yeshiva to use its property (the "Site") each summer as a religious retreat, for religious education, prayer, religious contemplation, and associated activities of the Yeshiva. CMR proposes to apply for a special permit to authorize such summer use. The

1

contemplated summer use would include the religious education of young adults and children, some of whom would be children whose families would reside at the Site all summer, and others who would be present without their families. At the pre-application meeting, the Town Planner -- without prior notice to or discussion with the applicant -- opined that the proposed summer religious retreat is not the type of use for which a special permit can be issued. This Memorandum of Law responds to that assertion and confirms that the proposed summer use is, as a matter of both fact and law, a religious use eligible for a special permit from the Town.

All of the contemplated summer uses, including religious educational use, have long been explicitly held by Federal and New York Courts to fall within the definition of religious use. Federal and New York Courts have held without exception that religious use is interpreted expansively in order to give effect to the freedom of religion enshrined in the United States Constitution.

After Congressional hearings confirmed that religious assemblies and institutions were disproportionately affected and often discriminated against in local land use decisions in violation of the United States Constitution, Congress adopted RLUIPA. *See* the United States Department of Justice Statement on the Land Use Provisions of RLUIPA (DOJ Statement) at 1. (A true and correct copy of the DOJ Statement is appended as Exhibit A.) Federal courts apply RLUIPA in land use cases involving houses of worship, religious schools, and religious retreat centers. *Id.* RLUIPA specifies that "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief and [t]he use, building, or conversion of real property for the purpose of religious exercise." DOJ Statement at 1, 4; RLUIPA 42 U.S.C. § 2000cc-5. "Religious exercise" under RLUIPA covers a wide range of activities, including accessory uses used for meetings, religious education, operation of a religious retreat center; and

2

expansion of religiously affiliated schools. RLUIPA 42 U.S.C. § 2000cc-5(7)(A); *see also* DOJ Statement at 4.

RLUIPA applies to state departments and agencies and their subdivisions, such as counties, municipalities, villages, towns, cities, city councils, planning boards, zoning boards, and zoning appeal boards. DOJ Statement at 4; RLUIPA 42 U.S.C. § 2000cc-5(4). When a conflict arises between RLUIPA and a zoning code or how it is applied, RLUIPA, as a federal civil rights law, takes precedence. DOJ Statement at 5.

Accordingly, what is "religious use" cannot be limited by any definition that may be included in a local zoning law or by the absence of such a definition in a local zoning law. The Town Board of the Town of Highland (the "Town Board") in crafting local zoning lacks the power to narrow the scope of what constitutes religious use. Indeed, no local legislative body has the power to define away what is included in the constitutionally protected exercise of religion. That principle has been explicitly recognized by Federal and New York Courts and is discussed below.

CMR seeks a special use permit from the Planning Board for a place of worship in the summer months so the Site can be used in those months as a place of religious educational retreat. For the reasons set forth in greater detail below, the Planning Board has jurisdiction to hear such an application because CMR's proposed summer use of the Site falls well within the judicially accepted law definition of religious use at a place of worship.

## STATEMENT OF FACTS

The Site is located at 211 Mail Road, Barrysville, New York. Since July 1, 2015, the Site has operated year round as a "Hotel" which is a specially permitted use in the Residential-Agricultural (R-2) Zoning District. CMR will continue this use in the non-summer months and proposes to use the Site during the summer months as a religious educational retreat for the

3

Yeshiva. In the summer months Hasidic young adults, children, and families will come to the Site to study Torah, communicate and study with their Rabbi, deepen their religious faith, and connect on a religious level with others of their religious community. Religious education is one of the most important elements of Hasidic Jewish life. Accordingly, one of the core purposes of the proposed summer use is for religious education of high school age students. Some of the students that would be given religious education at the Site are the children of the families that will reside on Site during the summer months. Others will be sent to the Site by their families so they can be educated by and under the supervision of the Yeshiva's Rabbis. It is for these uses and on this basis that CMR, on behalf of the Yeshiva, has applied for a special permit for religious use as a place of worship under the applicable Residential Agricultural (R-2) zoning to operate the Site for religious educational retreat use during the summer months.

The Town Zoning Law designates "places of worship" as specially permitted uses in the Town's Residential Agricultural (R-2) zoning districts which is where the Site is located. *See* Zoning Law § 190 Schedule B. As discussed in greater detail below, all of the uses which CMR proposes to undertake at the Site during the summer months fall within the meaning of a "place of worship" under common law and RLUIPA.

The Planning Board referred the pre-application to Laberge Group. The Laberge Group issued a memorandum dated March 20, 2023 in which it concluded as follows:

- Religious Retreat is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.
- Dormitory is not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations and is therefore a prohibited use.
- Mikvah, while not specifically listed in the Chapter 190 Schedule 2: Schedule of Use Regulations, is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.

4

- Multi-purpose building while not specifically listed is a common element of a "place of worship." A place of worship is listed as a Special Use Permit (SUP) on the Chapter 190 Schedule 2: Schedule of Use Regulations.

Thus, the Laberge Group concluded that the Mikvah and multi-purpose building were allowed under the "place of worship" use, but use as a religious retreat and for a dormitory were not allowed.  For the reasons discussed in detail below, all of the proposed uses and activities are ones that are religious in nature and fall well within the meaning of a place of worship as determined by the New York and Federal courts.

### ARGUMENT

### A "PLACE OF WORSHIP" INCLUDES USE AS A RELIGIOUS EDUCATIONAL RETREAT

Federal and New York Courts have been quite clear that when used in a local zoning law, the terms "religious institution," religious use, or "place of worship" are legal matters and not ones that invoke the technical expertise of administrative boards, such as a zoning board of appeals or planning board.  For example, in *Yeshiva Talmud Torah Ohr Moshe v. Zoning Board of Appeals of The Town of Wawarsing* (*Talmud Torah*) 170 A.D.3d 1488 (3d Dept. 2019), the Town's ZBA issued an interpretation that religious use did not include overnight residence during the summer months for religious educational purposes and that such use was a school or camp use. The Appellate Division described the issue as follows:

> Respondent Municipal Code Officer issued a written determination that the planned use of the property was not a permitted use in an NS district because, although a place of worship constitutes an allowable use, a camp or any type of occupancy that permits overnight residence of students, staff or families is not allowable. Petitioner thereafter sought review of the Municipal Code Officer's determination by respondent Zoning Board of Appeals of the Town of Wawarsing (hereinafter ZBA), which affirmed the determination of the Municipal Code Officer and concluded that the proposed use

5

> of the property did not fall within the definition of place of worship
> but, instead, was "akin to a school or a camp," neither of which is a
> permitted use in an NS district.

*Id*. at 1489.  In particular, like the Laberge Group, the ZBA stated that the proposed dormitory to house religious students was not a permitted use. Indeed, the Appellate Division held that all facilities that were needed for the summer educational retreat use were permitted as falling within the overall concept of religious use.  *Id*. at 1489 - 90.  That decision was rendered by the Appellate Division <u>as a matter of law</u>.

Thus, in adjudicating the appeal of the ZBA's interpretation of the Town of Wawarsing zoning law, the Appellate Division held that determining the meaning of the terms used in a zoning law was the province of the courts and that deference to an administrative board like the ZBA or the Planning Board is not required:

> Judicial review of a determination of a zoning board of appeals is generally deferential, and that body is accorded reasonable discretion in interpreting an ordinance that addresses an area of zoning where it is difficult or impractical for a legislative body to lay down a rule which is both definitive and all-encompassing. <u>However, where, as here, the issue presented is one of pure legal interpretation of the underlying zoning law or ordinance, deference is not required.</u>

*Id*. (emphasis added; external and internal quotation marks and citations omitted); *see also Raritan Dev. Corp. v. Silva*, 91 N.Y.2d 98, 102 (1997).

The Highland Zoning Law does not contain a definition of "places of worship." Accordingly, the undefined term or phrase is to be given its plain or ordinary meaning. *See* McKinney's Statutes § 232 entitled "Words of ordinary import" and which provides as follows:

> Words of ordinary import used in a statute are to be given their usual and commonly understood meaning, unless it is plain from the statute that a different meaning is intended.

*See Sullivan v. Board of Zoning Appeals of Albany* ("*Sullivan*"), 144 A.D.3d 1480, 1482 (3d Dep't 2016) (holding that "[i]f the ordinance at issue does not define a particular term, courts will afford such term its plain or ordinary meaning, and any ambiguity in the language employed must be resolved in favor of the property owner."); *see also Talmud Torah*, 170 A.D.3d at 1489 (holding that a vague zoning law is construed in favor of the property owner and against the municipality). In that regard, the *Talmud Torah* court made clear that the New York courts "have been very flexible in their interpretation of religious uses under local zoning ordinances." *Id*. Given the absence of a definition of "places of worship" in the Highland Zoning Law, it must be interpreted by giving the phrase its ordinary meaning and with any ambiguity favoring the religious use of the Site.

For more than 60 years, New York and Federal Courts have repeatedly opined on the scope of religious uses and activities and have consistently held that religious use should be construed broadly. The basic principles were enunciated by the New York Court of Appeals in *Matter of Community Synagogue v. Bates ("Bates")*, 1 N.Y.2d 445, 453 (1956), a case which arises under facts and circumstances quite similar to the ones presented by CMR. In *Bates*, the petitioner applied for a permit to use its premises for a synagogue, Sunday school, and facilities for the use of the synagogue's social groups and community service activities—in other words, "a permanent place for religious worship, religious teaching and training, fellowship, [and] guidance of indoor and outdoor activities for youth and community work." *Id.* at 448. The Village of Sands Point Zoning Board of Appeals denied the petitioner's application concluding that the proposed uses were not for a church for public worship and other strictly religious use. Essentially, the Sands Point ZBA parsed the activities allowing some, but finding others outside the scope of a religious use.

7

Thus, in *Bates*, the Court of Appeals was required to address the nature and scope of religious use in the context of local zoning. The Court of Appeals held that the Sands Point ZBA's conception of what constituted a place of worship and religious use were unlawfully restrictive:

> [A] church is more than merely an edifice affording people the opportunity to worship God. <u>Strictly religious uses and activities are more than prayer and sacrifice and all churches recognize that the area of their responsibility is broader than leading the congregation in prayer.</u> Churches have always developed social groups for adults and youth where the fellowship of the congregation is strengthened with the result that the parent church is strengthened. . . . <u>To limit a church to being merely a house of prayer and sacrifice would, in a large degree, be depriving the church of the opportunity of enlarging, perpetuating, and strengthening itself and the congregation.</u>

*Bates*, 1 N.Y.2d at 453 (emphasis added).

Following the principle set forth in *Bates*, Federal and New York Courts have readily acknowledged that a very wide variety of facilities and functions are included within the broad definition of a church, synagogue, or other place of worship at common law. In *Diocese of Rochester*, 1 N.Y.2d 508, 516 (1956), the Court of Appeals annulled a town planning board's denial of a permit for a proposed religious facility containing "[a] school; meeting room; kindergarten, small games, open field and hard-top play areas; and parking lot. . .". The Court of Appeals held that all such uses were fully encompassed within the definition of "church." The court, citing *Bates*, held that these uses were clearly "within the scope of a church's activities." *Id.* at 525.

In *Sullivan*, *supra*, the Third Department upheld a zoning board's determination that a parsonage on a church's property in which the church planned to house homeless individuals was within the purview of a "house of worship." 144 A.D.3d at 1482. The applicable City of Albany zoning code defined "house of worship" as "[a] structure or part of a structure used for worship or

religious ceremonies." *Id.* at 1481. In the absence of a specific statement as to what related uses might be contemplated by this definition, the court looked to the common law treatment of the term "house of worship" stemming from the Court of Appeals' decision in *Bates* and was "satisfied that the plain or ordinary meaning of 'house of worship' permits and encompasses the uses proposed by the church and Family Promise [the non-profit organization slated to run the parsonage]." *Id.* at 1482.

In *Committee to Protect Overlook, Inc. v. Town of Woodstock Zoning Board of Appeals*, the Third Department affirmed a zoning board decision that a proposed Tibetan monastery was a "church or other place of worship" and rejected the argument that certain proposed elements— such as bedrooms, a dining hall, office space, and a library—were "non-religious" and therefore not encompassed by the term "place of worship." 24 A.D.3d 1103, 1104 (3d Dep't 2005), *lv. to appeal denied*, 6 N.Y.3d 714 (2006). The Town of Woodstock zoning law did not define "church" or "place of worship," so the court looked to the broad common law definition of these terms. *Id.* Recognizing the project applicants' showing that "Buddhist practice . . . includes teachings and monastic retreats requiring residency at the monastery," the court found that the full extent of the proposed monastery, including the facilities petitioners argued were intended for "non-religious" uses, was encompassed within the definition of "place of worship." *Id.* at 1105.

In *Faith for Today v. Murdock*, 11 A.D.2d 718, 719 (2d Dep't 1960), *aff'd* 9 N.Y.2d 761 (1961), the petitioner filed suit challenging the denial of its application for a permit to expand an existing religious facility. The Second Department held (and the Court of Appeals affirmed) that "modern office machinery and equipment" including a printing press for production of correspondence courses and a "dining room, kitchen, printing shop, [and] storage room" were all encompassed within the meaning of "church" use.

9

In *Shaffer v. Temple Beth Emeth*, 198 A.D. 607, 609 (2d Dep't 1921), the Second Department evaluated the scope of the term "church" as used in a restrictive covenant. The court held that a building in addition to the proposed synagogue which was to include "an assembly room for Sabbath school children, [and] a gymnasium" also fell within the term "church." *Id.*

In *In re Garden City Jewish Center,* 157 N.Y.S.2d 435 (Sup. Ct. Nassau Cnty. 1956), the court applied *Bates* and held that a provision of a religious use permit that prohibited the use of a religious facility for group activities other than religious services and Sunday School was unlawful in light of the broad definition of "church" use. In *Westbury Hebrew Cong. v. Downer*, 59 Misc.2d 387 (Sup. Ct. Nassau Cnty. 1969), the court held that on-site classrooms used for teaching both religious and secular subjects fell within the scope of "synagogue" use, such that a separate non-public school use permit was not required. Similarly, in *Unitarian Universalist Church of Central Nassau v. Shorten*, 63 Misc.2d 978 (Sup. Ct. Nassau Cnty. 1970), the court held that "operation of a day care is . . . well within the ambit of religious activity" that exemplifies a church use.

Finally, and most recently, in *Talmud Torah* the Third Department determined that the Town of Wawarsing's definitions of religious use included and authorized the religious educational and other religious uses proposed. However, the Court further held that it would have reached the same conclusion even if the Town's zoning law definition had been ambiguous:

> We conclude that this definition unambiguously includes the living facilities proposed for students of the school, particularly in light of petitioner's representation that its purpose in constructing the facility is to provide religious instruction at a location with tranquil natural surroundings that facilitate reflection and study—a use that is consistent with a retreat house—and, thus, such facilities are permitted uses under the Town's zoning ordinance. <u>Moreover, had we found the definition ambiguous, we would have been required to resolve any ambiguity against respondents, especially in light of the flexibility required to be given to definitions of religious uses.</u>

*Talmud Torah*, 170 A.D.3d at 1490 (emphasis added).

10

Predicated upon all of the foregoing authorities, there can be no doubt that "places of worship" includes the religious retreat uses which are proposed by CMR, as well as the dormitory to house religious education students. Indeed, any doubt must be resolved in favor of religious use given the constitutionally protected status of religious use. Religious use is accorded a special status with respect to the application of zoning laws and such uses are considered "beneficial to the public welfare by their very nature." *Jewish Reconstructionist Synagogue of North Shore, Inc.*, 38 N.Y.2d at 286; *see also Bates*, 1 N.Y.2d 445; *Matter of Diocese of Rochester v. Planning Bd. of Brighton*, 1 N.Y.2d 508 (1956). The "peculiarly pre-eminent status of religious institutions under the First Amendment provision for free exercise of religion remains an important factor" in zoning decisions pertaining to religious land uses. *Jewish Reconstructionist Synagogue*, 38 N.Y.2d at 288. Thus, although "religious institutions are not exempt from local zoning laws, greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made." *Gospel Faith Mission Int'l Inc. v. Weiss*, 112 A.D.3d 824, 825 (2d Dep't 2013).[1]

RLUIPA specifies that "religious exercise" includes the following:

> (A) In general.-The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

> (B) The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

---

[1] One of the few New York cases to find non-religious use is *Sid Jacobson Jewish Community Center, Inc. v. Zoning Bd. of Appeals of Incorp. Village of Brookville*, 192 A.D.3d 693 (2d Dept. 2021). There, even though the community center was a religious organization, the court held that the summer activities and programs offered were predominately athletic and recreational in nature (sports, swimming, horseback riding, and diving), and not religious. That is not the case with CMR. The principal activities are religious in nature, including religious education, prayer, study, communication and study with the Rabbi, and religious retreat.

RLUIPA 42 U.S.C. § 2000cc-5(7). *See also* 42 U.S.C. § 2000cc-3(g), providing that RLUIPA's provisions are to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."

Congress did not specifically define the terms "religious institution" or "religious assembly." Thus, similar to the New York Courts, the federal courts have acknowledged the expansive scope of religious use under RLUIPA. For example, in *City Walk-Urban Mission Inc. v. Wakulla Cty. FL*, 471 F. Supp. 1268, 1282-83 (N.D. FL 2020), the District Court held that a church's use of property as a religious transition home to house and rehabilitate people in need, including registered sex offenders, constituted a religious use. *See also Church of the Hills of Township of Bedminster v. Township of Bedminster* ("*Church of the Hills*"), 2006 WL 462674, U.S.D.C. D. New Jersey, at *5. There the district court, quoting from the statute's legislative history, acknowledged that the ability of religious institutions to develop "a physical space adequate to their needs and consistent with their theological requirements is the "heart of the RLUIPA's land-use provisions," (citing 146 Cong. Rec. S7774-01, Joint Statement of Sen. Hatch and Sen. Kennedy on RLUIPA). *See also Congregational Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 424 (S.D.N.Y. 2015) (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).

The Third Circuit Court of Appeals in *LeBoon v. Lancaster Jewish Community Center Ass'n* ("*LeBoon*"), 503 F.3d 217 (3rd Cir. 2007) enumerated nine factors it applied in determining whether an entity and its proposed use are religious:

> (1) whether the entity operates for a profit,
> (2) whether it produces a secular product,
> (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose,

12

> (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue,
>
> (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees,
>
> (6) whether the entity holds itself out to the public as secular or sectarian,
>
> (7) whether the entity regularly includes prayer or other forms of worship in its activities,
>
> (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and
>
> (9) whether its membership is made up by coreligionists.

*LeBoon*, 503 F3d at 226.

If the nine factors were to be applied, the proposed summer religious retreat use and religious education dormitory would satisfy all nine. The summer religious educational retreat and dormitory are an extension of the operations of Yeshiva Ohr Shraga Veretzky, which operates a Hasidic Orthodox Jewish Yeshiva in Brooklyn, New York during the non-summer months. The Yeshiva does not operate for profit. Its organizational documents are religious in nature and have a religious purpose. The Yeshiva holds itself out to the public as a religious organization and does not produce a secular product. The Yeshiva is affiliated with and financially supported by a synagogue. The Yeshiva regularly includes prayer in its activities, as well as religious instruction. It is entirely comprised of Hasidic Orthodox Jewish members. The Yeshiva will be the sole user of the Site during the summer months for its summer religious educational retreat.

Although the Second Circuit itself has not outlined specific "religious characteristics" to determine religious activities, a district court in the Second Circuit did consider the *LeBoon* factors in *Aparicio v. Christian Union, Inc.,* 2019 WL 1437618 at *4, *5 (S.D.N.Y 2019). After applying the factors the Court determined that the Christian Union was a religious organization.

Finally, DOJ Statement acknowledges that the courts have applied RLUIPA to the following activities which were held to be religious assemblies and/or institutions: "individuals holding prayer meetings in their homes, religious schools, religious retreat centers, cemeteries, and faith-based social services provided by religious entities. (DOJ Statement at 4 (emphasis added).)

## CONCLUSION

Based on the foregoing, the proposed religious educational retreat uses, and associated dormitory, are ones that fall within the definition of the term "place of worship" and therefore are specially permitted under the applicable R-2 zoning. "Place of worship" inherently includes the proposed summer retreat and educational facilities at the Site, including the dormitory. The use of the Site in the summer months as a religious educational retreat is almost identical to the uses found to be religious in *Talmud Torah, supra.* In addition, the proposed religious educational retreat is a protected religious use under RLUIPA.

Accordingly, as a matter of law, the proposed religious educational retreat use and associated dormitory are allowed under the Town's zoning as a specially permitted use. Therefore, the Planning Board is required to take jurisdiction over and act upon the pending application. Failure or refusal to do so would be a violation of both New York law and RLUIPA.

Dated: New York, New York
      April 27, 2023

SIVE, PAGET & RIESEL P.C.
*Attorneys for Catskills Mountains Resort*

By: _____
    Steven Barshov
    560 Lexington Avenue, 15th Floor
    New York, New York 10022
    (646) 378-7229 (direct)
    (917) 886-4328 (cell)
    sbarshov@sprlaw.com

14

Town of Highland Planning Board
Meeting Minutes June 28, 2023

Chairman calls the meeting to order at 6:00 PM

Pledge to the Flag

Chairman states the minutes are being recorded

Secretary takes attendance.

| Attendance: | Norm Sutherland | Present |
| | JT Vogt (co-chairman) | Present |
| | Jeffrey Spitz | Present |
| | Steve Bott | Absent |
| | Tim McKenna | Present |
| | Laura Burrell | Present |
| Board Secretary | Monica McGill | Present |
| Town Attorney | Michael Davidoff | Present |
| Code Enforcement | | Absent |

Also, in attendance – Scott Reed (alternate)

Motion to approve the May 24, 2023 meeting minutes:
Motion: Jeff Spitz          Second: JT Vogt
All in favor

## Application #14-2023 SPSTR 1 LLC Short Term Rental Public Hearing
Motion to open the public hearing on application #14-2023:
Motion: Tim McKenna          Second: Jeff Spitz
All in favor
Secretary reads the public notice published in the local newspapers.
There were (22) letters mailed to the surrounding neighbors and (17) returned
Skylar Vaughn attended the meeting for SPSTR 1 LLC.
The property is a two-bedroom home purchased in 2021.
There were no comments from the public and the board.
Motion to close the public hearing on application #4-2023:
Motion: JT Vogt          Second: Tim McKenna
All in favor
The owners of the property were not present for their scheduled fire inspection, therefore there will be no resolution for this applicant and planning board will do the lead agency for SEQR at the July 26, 2023 meeting.

The board suggests that Mr. Packer meet with Susan Roth and discuss the report and come to an agreement.

Eve Fisher and her husband ask the board to allow her to open the wine shop pending a determination from the National Park Service and Mr. Packer's meeting with LaBerge Group.

The board decides to recess the public hearing until July 26, 2023 at which time they hope to have all that is needed to approve the application.

Motion to recess the public hearing on application #12-2023:

Motion: Jeff Spitz                    Second: JT Vogt

All in favor

Eve and her husband are very excited to become a part of the community, but feel they are being strung along with the entire process. They have financially invested a lot of money and are eager to open their doors for business.

## Application #7-2023 Catskill Resort 211 Mail Road Site Plan Review

Application Re-cap:

The applicant Yeshiva Ohr Shraga Veretzky has applied to add a religious resort to the existing use of Hotel / Motel / Restaurant. They want to construct (4) dormitories to supply sleeping accommodations for their students. Each dormitory will be 5,800 square feet and one story tall. In addition, they want to add an 800 square foot building to be used as a mikva (ritual bath) and finally a 10,150 square foot one story tall building to be used for studying, lectures, prayer etc.

Correspondence: Fusco Engineering (Code Consultant) Report (read into record by chairman Norm Sutherland ) and attached to the minutes.
LaBerge Group Memorandum (Town of Highland Engineering Firm (presented by Susan Roth – Senior Planner)

Both reports were presented at the current meeting and will need to be reviewed before making any decisions.

Appearing on behalf of the applicant was Steven Barshov Attorney. Mr. Barshov wanted to begin the process of lead agency, but the board will hold off on the lead agency and the scheduling of a public hearing until all comments from the above-mentioned reports can be reviewed and addressed.

The applicant will be added to the July 26, 2023 agenda.

## Application #5-2022 Camp Fimfo – Catskills (Kittatiny) Site Plan Review

The board is still awaiting a decision from the NPS (National Park Service)

Daniel Rubin Attorney for the applicant expresses his disappointment and concern in regards to the process his clients have had to endure for over a year,

# FUSCO
### ENGINEERING &
### LAND SURVEYING, D.P.C.

233 East Main Street     Phone: (845)344-5863
Middletown, NY 10940     Fax: (845)956-5865

*Consulting Engineers*

*Alfred A. Fusco, Jr.*      *Alfred A. Fusco, III*
*P.E. Principal*          *General Manager*

June 26, 2023

Norman Sutherland, Planning Board Chairman
Town of Highland
4 Proctor Road
Eldred, New York 12732

RE:   211 Mail Road
      Preliminary Review
      Town of Highland
       SBL 15-1-70.1 and 70.2
      Our file # HL-004

Dear Chairman Sutherland,

We have reviewed the material submitted to us by Michael Davidoff, Esq. and are providing this review as the Town of Highland Planning Board Consultant.

| | |
|---|---|
| Project: | Applicant – John D. Fuller, P.E. for Yeshiva Ohr Shraga Veretzky |
| Address: | 211 Mail Road |
| SBL: | 15-1-70.1 and 70.32 |
| Zone: | Agricultural – Residential – R2 |
| Request: | Special Use Permit – Change of Use |

Project: Hotel site with four (4) 5,800 square feet dormitories, one 800 square foot Mikvah, a 10,150 square foot multi-purpose building and additional use as a place of worship.

Material Reviewed:
        Site Plan – John Fuller, P.E. 6/10/23
        Application
        EAF and Narrative
        Laberge Group memorandum
        Memorandum of Law regarding case law for New York Law and (RLUIPA) Federal Religious Land Use and Institutionalized Persons Act of 2000

COMMENTS - SEAF:

1.   13a) Wetlands or other bodies of water need to be shown on site plan.

2.   13b) SEAF indicated wetlands not impacted.